Daniel L. SANDERS, Petitioner–
Appellant,

v.

Leslie RYDER, Respondent–Appellee.

No. 01–35675.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 2003.

Filed Sept. 4, 2003.

Michael C. Kahrs, Seattle, Washington, for the petitioner-appellant.

Gregory J. Rosen, Attorney General's Office, Olympia, Washington, for the respondent-appellee.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Daniel Sanders was convicted of child molestation in Washington state court. After appealing unsuccessfully in state court, Sanders filed a federal habeas petition. The magistrate judge ruled that some of Sanders's claims had not been exhausted in state court, and that the Washington courts' rulings on the other claims were not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court. The district court adopted the magistrate judge's ruling. Because we hold that Sanders ex-

hausted his federal ineffective assistance of trial counsel claim in state court, we reverse.

## I. Background

Petitioner-appellant Daniel Sanders maintains that he is innocent of the charge of child molestation of which he was convicted and that he received a woefully unfair trial in Washington state court. During late May and early June of 1997, Sanders went to stay with Patti Kelley, his ex-girlfriend, so that he could spend some time with their fourteen-year-old son Gabe. Kelley also lived with her three-year-old son Tyler, who was not Sanders's child. Both Sanders and Kelley were drug users. A few days into Sanders's visit, Kelley went to police and accused Sanders of sexually assaulting Tyler.

According to Sanders, Kelley fabricated the accusation to retaliate against Sanders after a fight. Sanders says that Tyler had "gotten into" Kelley's stash of methamphetamine while Kelley slept. Sanders, concerned about Tyler's welfare, told Kelley that he would call Child Protective Services if she did not take better care of the children. Sanders claims that Kelley, in response, contacted police and made a false report that Sanders had masturbated on Tyler. Sanders was charged with Child Molestation in the First Degree.

At Sanders's trial, Kelley testified that Tyler had told her that Sanders's penis had "spit in his face." Tyler himself did not testify. The judge found Tyler incompetent because, during a pretrial hearing, Tyler said "My mom told me to say these things about [Sanders]," and he would not, or could not, identify Sanders in the courtroom. Although Kelley said she had put Tyler's clothes and the washcloth used to clean him in a bag for police, no semen was found on any of the items. Tyler was examined the day after the alleged incident, and though Kelley said she had not bathed him, no semen was found on him. The prosecution's only physical evidence in the case was semen found on the carpet of the room where Sanders had been staying and where he admitted that he had masturbated.

Sanders maintained that he was innocent and that Kelley had fabricated the charges against him and had instructed her young son Tyler to lie. In his habeas petition, he states that he asked his attorney Thomas Ladouceur, who had been appointed by the state court, to call various witnesses in his defense. In support of his claim that Kelley had fabricated the charge following a fight about Kelley's drugs, Sanders identified a neighbor who had witnessed the fight. Ladouceur did not call or interview the neighbor as a potential witness. Kelley testified that she had not fought with Sanders, and Ladouceur made no effort to impeach her testimony.

Sanders claims that Kelley had a history of threatening and making false charges. Sanders identified witnesses who would testify that Kelley, in the course of various disputes with Sanders, had frequently threatened to call the police and falsely report that he had committed crimes or violated his parole. Sanders identified witnesses who would testify that Kelley had a history of coaching her children and forcing them to lie. Ladouceur, however, did not call or interview any of these witnesses.

Sanders claims that Kelley had previously fabricated molestation charges against another man. According to Sanders, Kelley had a dispute in 1995 with a man nicknamed Grizzly about drug money. Kelley called the police and claimed that Grizzly had molested Gabe. Grizzly was convicted of the charges, but Gabe later told Sanders that Kelley had told him to make up the story. Sanders spoke with

Grizzly and asked Ladouceur to interview him, but Ladouceur made no effort to investigate the prior incident involving Grizzly and Gabe.

Sanders also identified several potential character witnesses. Sanders claimed that, though he had a checkered past in some respects, he had never committed any violent or sexual crimes. He suggested that Ladouceur call witnesses to testify to his good character. Ladouceur did not interview or call any such witnesses.

Finally, Sanders identified a disinterested third-party witness, Dee Ann Wren, who could establish an alibi. After his fight with Kelley, Sanders did not want to stay at her apartment any longer, and he began searching for a place to live. Sanders contacted Wren, whom he had never met before, and discussed the possibility of moving into Wren's house. During the time that Kelley claimed Sanders assaulted Tyler, Wren says that she and Sanders were on the telephone together. Wren says that she and Sanders were on the phone for a lengthy period while she asked him various questions to evaluate whether he would be a good tenant. Wren says that, over the telephone, she could hear Tyler coming into the room and that Sanders's several times had to interrupt the telephone conversation to scold Tyler and ask him to leave. After Sanders had been arrested, Wren contacted Ladouceur and offered to testify, but Ladouceur did not interview Wren or call her to testify.

Sanders states that he repeatedly contacted Ladouceur before trial and implored him to interview witnesses who would support his story. According to Sanders, Ladouceur made no attempt to investigate his claims. Sanders had some potential witnesses contact Ladouceur, but Ladouceur told them that their testimony was not needed. To the extent that Ladouceur gave any explanation for his tactics, he said that calling the other witnesses would be unwise because it would allow the prosecution to admit damaging evidence about Sanders's past. Damaging evidence about Sanders's past was admitted anyway, however, since the judge ruled before trial that the prosecution could use certain prior convictions and Sanders's history of drug use to impeach his trial testimony.

Ladouceur did not call any of Sanders's proposed witnesses. Other than Sanders himself, Ladouceur called no witnesses at all. Ladouceur did not seek to call Tyler or to inform the jury that Tyler had previously testified that his mother had "told me to say these things about [Sanders]." Ladouceur's primary defense was to suggest that Sanders had splashed water on Tyler's face, and that Tyler had misinterpreted harmless · playing as molestation. Ladouceur also emphasized that Sanders had been alone with Tyler several times, apparently to suggest that if Sanders wanted to assault Tyler, he would have done it sooner. Sanders became so frustrated with Ladouceur's performance that he asked the trial judge if he could have a new lawyer or proceed pro se, but the judge reminded Sanders that Ladouceur had legal expertise and that he might have sound tactical reasons for his decisions that Sanders did not understand.

After about an hour of deliberation, the jury found Sanders guilty. Disgusted by Ladouceur's performance at trial, Sanders's family put together enough money to hire a private attorney, Mary Gaffney. With Gaffney's help, Sanders hoped to appeal his conviction and seek a new trial.

However, after the jury's verdict but before sentencing, the prosecutor threatened to bring new charges of perjury and witness tampering against Sanders. The basis of the perjury charge was the following exchange during the prosecutor's cross-examination of Sanders at trial.

Prosecutor: [In addition to other drug charges already mentioned,] you have also been involved with drugs in the past, is that correct?

Sanders: Yes, I have.

Prosecutor: On numerous occasions?

Sanders: [inaudible.]

Prosecutor: Numerous, Mr. Sanders?

Sanders: There's been a couple, yes.

Prosecutor: Only a couple? That's your testimony—only a couple?

Sanders: There's been—

Prosecutor: Am I correct that it's been numerous?

Sanders: Yes. Yes.

The prosecutor apparently intended to argue that Sanders's initial response that he had been involved with drugs on "a couple" occasions was perjurious because it inadequately portrayed the extent of his previous drug problem. The basis of the witness tampering charge was Kelley's claim that Sanders, during a court proceeding, had turned around and mouthed "I'll get you" to her. But according to Sanders, he had actually mouthed "I love you" to his sister. Sanders and Gaffney believed that the additional charges were baseless, but the prosecutor threatened to file them and let a jury decide.

The prosecutor also threatened to seek an upward departure from the usual sentencing range for child molestation. The prosecutor said that Sanders was "looking at an exceptional sentence that's going to exceed maybe his life expectancy." But the prosecutor did offer Sanders a deal of sorts. The prosecutor said that if Sanders would waive his right to appeal and his right to seek a new trial, she would not pursue the additional charges, and she would recommend a sentence of only 108 months in prison.

Sanders maintained that he was innocent, that his trial had been a sham, and that Ladouceur had entirely failed to present a meaningful defense. He wanted the chance to vindicate himself on appeal. But Sanders also did not want to subject himself to the very lengthy prison term that could result from additional charges and an exceptional sentence. At a sentencing hearing, Sanders was presented with his options.

Gaffney [Sanders's attorney]: Mr. Sanders, do you have any questions—

Sanders: Yeah, I've got a lot of them.

Court: Okay.

Sanders: How does the Court of Appeals work, sir? Do you know?

Court: Never been on it.

Sanders: It says here, "Voluntarily and without"— what is it—"threatening"—where the hell part is that in there?

Gaffney: "No threats or promises of any kind"

other than that they're recommending the 108 [months].

Sanders: Well, that's a threat.

Court: Well, that's not—that's not—this is—what they're saying is this is what has been agreed to. If you do this, the prosecution will do that.

Sanders: Otherwise known as blackmail or threat or—

Court: Well, if you consider that to be a threat, fine, I understand what you're saying. And that's what the exception is. No threats or promises other than what's set forth in writing. . . .

Prosecutor: And let's put him on record. The State's ability to make a recommendation is not a threat. I understand the defendant thinking it's such. But we're free to recommend any sentence we want, and we're—this is for his bene fit, not your benefit.

Sanders: But the judge always goes with what you say, always.

Prosecutor: And we're agreeing to recommend 108 instead of a lot more. So that's what the judge is asking you.

Sanders: And I want to sign this, but I don't want to give up my waiver of appeals.

Court: Well, you can't have both is what they're saying. If you sign this—that's what the State—it's called a bargain. It's called an agreement.

Sanders: A bargain? I didn't get—I didn't get nothin'.

. . . .

Prosecutor: [H]is attorney is recommending that he [take the deal]. So the judge does not have all day, and neither does Ms. Gaffney, and so the time is now to answer the question.

. . . .

Prosecutor: This is our bargain. If this bargain does not go through, then I'm free to do whatever I feel is appropriate.

. . . .

Gaffney: And I—just for the record, I told my client—he—only he can make this decision, no one can make it for him. It has to be his decision. I clearly don't want—

Sanders: I don't want to—[inaudible].

Gaffney:—my client to feel he's forced into it, and I don't want him to say, Well, I shouldn't have done it and my attorney told me to do it. Only you can decide. It's your life.

Court: That's right.

Sanders: Common sense tells me to take it and stuff, but I want my rights to appeal. How come I can't have that?

Court: Well, it doesn't—

Sanders: Why can't I have it?

Court: We aren't saving anything—the State's not saving anything by doing this. You're not giving up anything. This is a—if you had a right to appeal plus accept this, what good does it do

the State? How does it save them any time? How does it save the county any money? You're not—you're not getting something for nothing. Otherwise, they want to make sure they can give—throw the book at you.

Gaffney: I would anticipate, I don't know, an appeal could go anywhere 50 to 100 hours.

Court: Oh, yeah, absolutely.

Gaffney: So I think part of the State's position is the time that would be involved in appealing, because—and the resources, obviously. But only you can decide, Dan, and I clearly don't want you to go out and say I made you do this or I forced you to do it.

Sanders: Shhh.

Gaffney: I—only you can decide. It's your life.

Sanders: I don't know. I mean, I should, I know I should, but I—I don't know. I'm telling you, Judge, I don't know.

Court: I can't say anything one way or the other, Mr. Sanders, I can't do that. You have the advice of your attorney. You can refer to your attorney for that, and that's why you have attorneys. Gaffney: Of course, I have advised him on what I think would be his best position, but of course I—

Sanders: Do I have to do this right now—

. . . .

Court: Well, I don't know how long the offer's open for.

Prosecutor: Yes, right now.

Gaffney: I'm unavailable this afternoon.

Prosecutor: We've been having this discussion for weeks.

Sanders: Oh, my God.

. . . .

Sanders: How much is this 108 months?

Gaffney: It's nine years . . . .

Sanders: Pff. I can't believe that.

. . . .

Sanders: Damn it, man, I know better than to do this.

Prosecutor: Mr. Sanders, statements like that and the judge won't accept your waiver, so you need to either do it or not do it. You've already said you thought you should, and then you said what you just said, so you need to go one way or another here.

. . . .

Gaffney: [I]f you don't sign that, then we would still be arguing the motion for the new trial and we'd be still arguing the appeal right, and then she would ask for the new charges and the exceptional. And that's basically what we have to decide.

Sanders: And that's a hell of a lot more time.

Gaffney: See, and—

Sanders: My sister'd put up $3,000 to get a retrial—

Gaffney: That's not—

Sanders: Well, damn, you don't seem to understand, I—

Gaffney: Okay—

Sanders:—have been shot down and shot down and shot down and shot down. I had a lot for an attorney that came in here. I fired him halfway through court 'cause he didn't do a damn thing. I had witnesses to come in and everything, and here I'm getting pegged for this stuff.

Court: Mr. Sanders—

Deputy: We've got to go. We haven't got all day.

Court: That's it.

Deputy: So sign it or don't sign it, we have to leave.

Court: Yeah.

Sanders: God.

Gaffney: Only you can decide what to do, no one can tell you what to do, Dan. You need to tell the judge what you're doing, what you want to do. I see your signature, but I don't know, you don't seem like you want to—

Court: Mr. Sanders, before I even accept that, before I even look at that, I need to know whether you are signing that freely and voluntarily. That's the whole key. Those are the magic words, freely and voluntarily, with knowledge.

. . . .

Sanders: I have no choice but to take it.

Court: Mr. Sanders, do you wish me to execute this document or not?

Sanders: I have no choice but to take it.

Court: Well, when you say no choice, that means it's not being done freely. If you're telling me that this is the best thing that you think you can get, that's different. But don't be telling me you have no choice. Everyone has a choice. Don't tell me that, because then I won't sign it. So I need to know from you.

Sanders: I don't want any more time, Judge.

Court: Okay. That's different.

Prosecutor: So the Court is finding that this is freely and voluntarily, knowingly—

Sanders: When am I gonna see you again?

Prosecutor:—intelligently made, and then I would ask him to say yes or no when you ask him that question.

Court: I will, I'll go through that. Mr. Sanders, is this being made, your signing this agreement, are you doing so knowingly, knowing what's contained in here, yes or no?

Sanders: Yeah.

Court: Yes. Are you doing so intelligently?

Sanders: Yeah.

Court: Are you doing so voluntarily?

Sanders: Yeah.

Court: Okay. Based upon that, and your knowing that you're giving up the right to an appeal—right, you know that you're giving up the right to appeal? Say yes for me.

Sanders: Yeah.

Court: Thank you. Then I will sign it based upon those statements that you have just made.

Sanders subsequently moved to withdraw his agreement to the sentencing deal on the basis that he was coerced into accepting it, but the trial judge denied his request. The judge said to Sanders: "You had a more informed decision than almost anyone else that I know of." Sanders admitted that he had had a troubled life and that he had struggled with drugs, but he insisted that he was innocent of the crime and that he had never committed any violent or sexual crime. The judge was unmoved: "This is something different from drugs but frankly it's not a quantum leap when you hang around with those types of people because you're one of those people."

Sanders appealed his conviction to the Washington Court of Appeals. He argued, among other things, that he had received ineffective assistance of counsel, that the prosecutor had committed misconduct, and that he had not knowingly and voluntarily waived his right to appeal. The Court of Appeals held that Sanders had knowingly and voluntarily waived his right to appeal in exchange for a favorable sentencing recommendation and the prosecutor's promise not to pursue the additional charges. Because it held that he had waived his right to appeal, the Court of Appeals dismissed Sanders's other claims.

Sanders filed a pro se petition to the Washington State Supreme Court. He argued that he had not voluntarily waived his right to appeal, and that he should at least have some chance to have his claims heard. He said that he had been denied due process of law and that he had received ineffective assistance of counsel. The Washington State Supreme Court summarily denied his petition without comment.

In 2000, Sanders filed a pro se writ of habeas corpus in federal district court. Sanders argued, among other things, that he had been denied due process because he had been coerced into waiving his right to appeal, and that he had received ineffective assistance of counsel. The magistrate judge issued findings and recommendations in 2001. The magistrate judge concluded that Sanders had properly exhausted his due process claims in state court, but that the state courts' determination of his claims was not contrary to, and did not involve an unreasonable application of, clearly established federal law. The magistrate judge also concluded that all of Sanders's other claims, including his ineffective assistance of counsel claims, were barred because he had failed to exhaust them in state court. The district court adopted the magistrate judge's recommendations and dismissed Sanders's petition. Sanders appealed.

## II.   Discussion

■ A federal court may only grant a writ of habeas corpus with respect to a person incarcerated pursuant to a state court judgment if "he is in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and "has exhausted the remedies available in the courts of the State," id. § 2254(b)(1)(A). To exhaust a federal claim in state court, a prisoner must "give state courts a *fair* opportunity to act on [his] claims." *O'Sullivan v. Boerckel*, 526

U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (emphasis in original). Sanders argues that he exhausted his federal ineffective assistance of counsel claim by presenting it to the Washington State Supreme Court. We agree.

In his pro se brief to the Washington Court of Appeals, Sanders argued that he had received ineffective assistance of counsel. He explicitly cited the Sixth Amendment of the United States Constitution and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court's central ruling on the federal right to effective assistance of counsel. In his first pro se petition to the Washington State Supreme Court, Sanders did not cite *Strickland* or the Sixth Amendment, but he used the phrase "ineffective assistance of counsel" three times. His petition did not explicitly identify whether his ineffective assistance claim was based on the federal constitution, the state constitution, or both. He did not cite any state or federal cases, but at the end of one of the three sentences in which he claimed ineffective assistance, Sanders did cite § 22 of Article 1 of the Washington Constitution, which is the Washington equivalent of the federal Sixth Amendment. Following the state's answer to his petition, Sanders filed a reply brief in the Washington State Supreme Court in which he again argued ineffective assistance of counsel, this time explicitly citing the Sixth Amendment and *Strickland.*

Our recent en banc ruling in *Peterson v. Lampert,* 319 F.3d 1153 (9th Cir.2003) (en banc), which was issued after the district court's ruling below, controls our disposition of this case. In *Peterson,* we found that the petitioner had failed to exhaust his federal ineffective assistance claim in state court. But under the analysis outlined in *Peterson,* we believe that Sanders exhausted his federal ineffective assistance claim.

■ First, *Peterson* makes clear that, for the purposes of exhaustion, pro se petitions are held to a more lenient standard than counseled petitions. *Id.* at 1159 ("[T]he complete exhaustion rule is not to trap the unwary pro se prisoner." (quoting *Slack v. McDaniel,* 529 U.S. 473, 487, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (alteration in original))). We disavowed language by an earlier three-judge panel suggesting that pro se and counseled petitions should be read in the same way and held to the same standard. *Id.* Peterson's petition to the Oregon Supreme Court was counseled, but Sanders's petition to the Washington State Supreme Court was pro se.

■ ■ Second, *Peterson* makes clear that, depending on the context of his claim, a prisoner may alert a state court to the federal nature of the asserted right by using the phrase "ineffective assistance of counsel." Peterson had argued his federal ineffective assistance claim to the Oregon Court of Appeals, but in his petition to the Oregon Supreme Court he had only argued that he received *"inadequate* assistance of counsel," *id.* at 1157 (emphasis added), and thus employed the phrase usually used to refer to the Oregon state constitutional right:

> Peterson's petition for review to the Oregon Supreme Court did not refer to his appellate court brief, did not mention any provision of the Federal Constitution, and did not mention "ineffective" assistance of counsel. Peterson could have fairly presented his federal claim in a number of ways, including (but not limited to) the ways just mentioned, but here he specifically and exclusively alleged a violation of his right to "adequate" assistance of counsel under the Oregon Constitution.

*Id.* By contrast, Sanders's petition consistently and exclusively "mention[ed] 'ineffective' assistance of counsel."

Third, *Peterson* did not decide whether a prisoner may exhaust a federal constitutional claim by referring to a state constitutional right when the contours of the federal and state constitutional rights are identical. In *Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995), the Supreme Court held that a petitioner does not exhaust a federal claim by raising a state claim that is similar to the federal claim: "mere similarity of claims is insufficient to exhaust." A prisoner's vague claim in state court that his conviction was a "miscarriage of justice" was insufficient to alert the state court to an alleged violation of federal Due Process rights. *Id.* at 364–65, 115 S.Ct. 887. But "[t]he Supreme Court in *Duncan* left open the question of what happens when the state and federal standards are not merely similar, but are, rather, identical or functionally identical." *Peterson*, 319 F.3d at 1160.

■ The right to effective assistance of counsel is identical under the United States Constitution and the Washington Constitution. The Washington State Supreme Court has explicitly held that the right to counsel under § 22 of Article I of the state Constitution is "coextensive" with the Sixth Amendment right to counsel. *State v. Long*, 104 Wash.2d 285, 705 P.2d 245, 246 (1985); *see also State v. Thomas*, 128 Wash.2d 553, 910 P.2d 475, 480 (1996) (rejecting a claim that § 22 provides different protections from the Sixth Amendment); *State v. Rivera*, 108 Wash.App. 645, 32 P.3d 292, 294 n. 2 (2001) (same). When faced with ineffective assistance of counsel claims under both the federal and state constitutions, Washington courts analyze them both using the same *Strickland* test. *E.g., State v. Hendrickson*, 129 Wash.2d 61, 917 P.2d 563, 571 (1996); *State v. Mierz*, 127 Wash.2d 460, 901 P.2d

286, 291 (1995); *State v. Goodin*, 67 Wash. App. 623, 838 P.2d 135, 140 (1992). Indeed, it has become common-place for the Washington courts simply to refer to "ineffective assistance of counsel" claims—and to analyze them under the federal *Strickland* test—without specifying whether they are analyzing a state or federal right. *E.g., State v. Tilton*, 72 P.3d 735, 739 (Wash.2003); *In re Pers. Restraint of Tortorelli*, 149 Wash.2d 82, 66 P.3d 606, 612 (2003); *State v. McNeal*, 145 Wash.2d 352, 37 P.3d 280, 285 (2002); *State v. Cienfuegos*, 144 Wash.2d 222, 25 P.3d 1011, 1014–15 (2001); *State v. Bowerman*, 115 Wash.2d 794, 802 P.2d 116, 124 (1990). Sanders's first petition to the Washington State Supreme Court used the phrase "ineffective assistance of counsel" three times. Although one of those three mentions was followed by a citation to § 22, there is nothing to suggest that Sanders— a pro se petitioner—meant to allege "specifically and exclusively" a violation of his state constitutional right. *Peterson*, 319 F.3d at 1157.

■ Were there any remaining doubt about whether Sanders properly presented his federal claim, there is a fourth reason to distinguish this case from *Peterson*: Sanders's reply brief to the Washington State Supreme Court made clear that he meant to assert his federal constitutional right. In his reply brief, he explicitly cited the federal Sixth Amendment and the Supreme Court's ruling in *Strickland*. His reply focused on his trial counsel's performance at sentencing while his initial petition focused on his trial counsel's performance before the verdict, but he was not thereby raising a new and different federal claim in his reply. When we examine whether trial counsel gave effective assistance, we examine all aspects of the counsel's performance at different stages, from pretrial proceedings through trial and sentencing. *United States v. Leonti*, 326 F.3d 1111, 1116–17 (9th Cir.2003).

Separate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance. *See Villafuerte v. Stewart,* 111 F.3d 616, 632 (9th Cir.1997); *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir. 1978). They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel. In Sanders's reply brief to the Washington State Supreme Court, he made it abundantly clear that his ineffective assistance of trial counsel claim was a federal claim.

■ For the foregoing reasons, we conclude that Sanders presented his federal ineffective assistance of counsel claim to the Washington State Supreme Court in such a manner that that court had a *"fair opportunity"* to address his claim. *O'Sullivan,* 526 U.S. at 844, 119 S.Ct. 1728. Sanders's federal ineffective assistance of counsel claim was therefore exhausted in state court. Because the district court ruled that Sanders's ineffective assistance claim was unexhausted, it did not conduct an evidentiary hearing and did not reach the merits of Sanders's claim. We remand to enable the district court to conduct an evidentiary hearing and reach the merits.

Because we hold that Sanders exhausted his federal ineffective assistance claim, we need not reach the issue of whether his claim of actual innocence would excuse a failure to exhaust. *See Schlup v. Delo,* 513 U.S. 298, 313–17, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Because other issues raised in Sanders's petition may depend in part on the resolution of his ineffective assistance claim, we decline to reach those issues at this time.

REVERSED and REMANDED.