**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DINO WAYNE KYZAR,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN; STATE OF
ARIZONA ATTORNEY GENERAL,
*Respondents-Appellees*.

No. 12-17564

D.C. No.
CV-06-02015-
SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
November 19, 2014—San Francisco, California

Filed March 12, 2015

Before: Marsha S. Berzon and Johnnie B. Rawlinson,
Circuit Judges, and Elaine E. Bucklo, Senior District
Judge.[*]

Opinion by Judge Bucklo

---

[*] The Honorable Elaine E. Bucklo, Senior District Judge for the U.S.
District Court for the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's denial of Arizona state prisoner Dino Wayne Kyzar's habeas corpus petition challenging his conviction for conspiring with Leroy Cropper to commit a deadly or dangerous assault by a prisoner, in a case in which Cropper stabbed a correctional officer to death.

The panel held that Kyzar's pro se filings before the Arizona trial court and Arizona Court of Appeals fairly presented his sufficiency of the evidence claim, which was sufficient to exhaust his state remedies and avoid a procedural default.

The panel held, after reviewing the full trial record, that the Arizona trial court did not apply *Jackson v. Virginia*, 443 U.S. 307 (1979), in an objectively unreasonable fashion when it rejected Kyzar's sufficiency of the evidence claim, where the State presented evidence that Kyzar knew Cropper intended to attack someone, agreed to help him obtain a knife, and took an overt act in furtherance of this conspiracy.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Tara K. Hoveland (argued), South Lake Tahoe, California, for Petitioner-Appellant.

David A. Simpson (argued), Deputy Attorney General; Thomas C. Horne, Attorney General; Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section; and David A. Sullivan, Assistant Attorney General, Arizona Attorney General's Office, Phoenix, Arizona, for Respondents-Appellees.

**OPINION**

BUCKLO, Senior District Judge:

On March 7, 1997, Leroy Cropper, an Arizona prisoner, stabbed a correctional officer to death at the Perryville state prison. A jury convicted Petitioner Dino Kyzar of conspiring with Cropper and others to commit a deadly or dangerous assault by a prisoner in violation of Ariz. Rev. Stat. Ann. § 13-1206.

Kyzar sought federal habeas relief on multiple grounds. In Kyzar's first appeal, we vacated and remanded for the limited purpose of having the district court consider in the first instance whether the evidence adduced at trial was constitutionally insufficient to support his conviction. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (holding that petitioner is entitled to habeas relief if, after viewing the evidence in the light most favorable to the prosecution, "no rational [jury] could have found proof of guilt beyond a reasonable doubt").

On remand, the district court rejected Kyzar's sufficiency of the evidence claim. We affirm.

## I. Background

At this stage, we must view the record in the light most favorable to the prosecution and presume that the jury resolved any evidentiary conflicts in its favor. *Id.* at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). Moreover, we "cannot second-guess the jury's credibility assessments; rather, 'under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.'" *U.S. v. Nevils*, 598 F.3d 1158, 1170 (9th Cir. 2010) (en banc) (quoting *Schlup v. Delo*, 513 U.S. 298, 330 (1995)); *see also Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are…entitled to near-total deference under *Jackson*.").

## A. Facts

At the time of the murder, Cropper lived in Building 26 of the San Juan unit at Perryville prison. The building was divided into four pods—A, B, C, and D—with each pod having an upper and lower tier. Cropper lived in Cell No. 258 on the D pod's upper tier. Cropper's cellmate was Lloyd Elkins. Cropper and Elkins had been cellmates for about one month in Building 24 before they were transferred to Building 26 on March 3, 1997, four days before the murder.

While Cropper was living in Building 24—but before he was cellmates with Elkins—Kyzar gave him a nine to twelve inch steel knife with electrical tape wrapped around the base to form a handle. A few weeks later, after Cropper and Elkins became cellmates, Elkins saw Cropper in possession of a second knife with a serrated blade. According to Elkins, Cropper generally knew where to find knives buried around the prison yard. With respect to the prevalence of knives at Perryville, Cropper testified at trial that "[e]verbody on the yard ha[d] some type of weapon."

On the day of the murder, Deborah Landsperger, a correctional officer assigned to Building 26, discovered that mops and brooms were missing from the equipment room. Around 10:30 A.M., Landsperger and Brent Lumley, another correctional officer, decided to conduct a cell-to-cell search for the missing items. They started searching in the D pod's upper tier of cells.

Cropper and Elkins lived in the second cell searched. After Landsperger noticed tattoo patterns on top of a cabinet, she ordered Cropper and Elkins to exit the cell. Lumley did a pat down search of the inmates. The officers ordered Cropper and Elkins to wait outside the cell until the search was over.

Landsperger and Lumley confiscated several items of contraband during their search of Cell No. 258, including more tattoo paraphernalia, a serrated knife blade without a handle, and either a "cement nail," or a four to six inch "railroad spike." At some point during the search, Cropper came back into his cell and called Landsperger a "corncob cunt" and a "bitch." Lumley told Cropper, "Don't be doing that," which prompted Cropper to curse at Lumley too.

Cropper acknowledged that his tirade was so loud that other inmates in D pod probably heard him.

Landsperger and Lumley ordered Cropper to sit in the dirt area on the bottom tier of the D pod for the remainder of the search. Joshua "Tiny" Brice, an inmate who lived in the B pod of Building 26, saw Cropper standing by the stairs during the search. As Brice walked by, Cropper said that his cell was being shaken down. The search concluded around 11:30 A.M. because Landsperger and Lumley needed to count the inmates and take them to lunch.

Landsperger showed her supervisor, Lieutenant Hugh Matson, the knife she had confiscated from Cropper's cell and recounted his verbal tirade. Matson, Landsperger and one or two sergeants went to Cropper's cell to address his behavior. When asked if he had been verbally abusive towards Landsperger, Cropper said, "Fuck that bitch. She doesn't know what she's doing." Cropper told Matson, "Fuck you, punk. Get out of my fucking house, you little punk. Step off. I've got nothing to say to you." *Id*. Cropper also declared, "It's on," which Matson interpreted as a direct threat of violence. Cropper agreed that his words were a threat of revenge. Matson placed Cropper and Elkins on lockdown pending a disciplinary investigation. Cropper kicked or punched his cell door as the officers were leaving. *Id*.

After the correctional officers left, Cropper had a conversation with Eugene Long through the vent between their cells. Long lived in the neighboring cell, No. 257, with Bruce Howell. According to Elkins, Long characterized the shakedown of Cropper's cell as a form of harassment and said there "needed to be a fallout on the yard." Elkins testified

that Cropper was acting "like a maniac" after this conversation and ranting about how the correctional officers had disrespected him.

About twenty minutes after his first conversation with Long, Cropper said through the vent, "Hey, homeboy, go get Dino and Blue for me." Dino Kyzar and Sean "Blue" Gieslin were inmates who lived together in the A pod of Building 26 and exercised authority over the other white prisoners. A week or two before the murder, Gieslin told Dave Fipps, another inmate in Building 26, that Kyzar was running the yard to deflect attention from Gieslin. According to Fipps, Kyzar and Gieslin were the people to see if you needed a weapon because they were effectively in charge among the white inmates.

Shortly after lunch, Kyzar and Gieslin arrived at Cropper's cell. Elkins, who was sitting on his bed, overheard the conversation that took place through the cell door window. Cropper told Kyzar, "I want the good one," while making a stabbing motion. A "good one" is prison slang for a knife or "shank" with a handle on it. Kyzar responded, "I ain't got it. You got it." Cropper replied, "Give me any one." Kyzar then cautioned Cropper about his apparent intentions, "Well, are you sure about this? How much time you got, homeboy?" Cropper said, "It don't fucking matter. I'm a career criminal anyway." *Id.* As Kyzar and Gieslin were leaving, Cropper said, "You guys need to get off the yard," an expression that was not defined at trial. The entire conversation between Cropper and Kyzar lasted about two minutes.

As Joshua Brice was returning from lunch, Gieslin, Kyzar, and Long approached him near a picnic table in the B

pod.  Kyzar instructed Brice to "[s]how Eugene [Long] where the shank is."  Brice responded that he did not know exactly where to find a knife.  Kyzar replied, "Just show him the general area."  *Id*.  Brice complied because of the respect Kyzar commanded among the white inmates.

Brice indicated to Long a dirt area in the B pod where another inmate had buried a knife about one month earlier. Brice watched for guards while Long started digging in that area.  As Long was digging, Clifford Settle, an inmate who lived on the B pod's bottom tier near where Long was digging, asked Brice if he was looking for a knife.  Brice said no, but indicated that Long was trying to find a shank.  After Brice summoned Long, Settle told them a knife was hidden between two concrete slabs outside his cell.  Long straddled the concrete slabs, pulled out a knife, and concealed it in his pants.  Brice and Long then walked back to their respective cells.

Meanwhile, Kyzar and Gieslin encountered Dave Fipps in the yard as they were heading to the administration building.  Gieslin cryptically instructed Fipps to go to Long's cell to see if everything had been handled.  When Fipps arrived at Cell No. 257, Howell was standing outside keeping watch while Long and Brice were inside the cell.  Fipps reported that Kyzar and Gieslin wanted to know if everything was being handled.  Brice said yes.

According to Brice, Fipps held two flyswatters that Long had taped together while Long taped the knife he had retrieved to the flyswatters.  Long stood on the toilet in his cell and called through the vent, "Hey, Padlock," which was Cropper's nickname.  Elkins heard Long tell Cropper, "I got it," to which Cropper responded, "Let me see it."  After Long

showed Cropper the knife, Cropper said, "That ain't the good one. Fuck it. Send it through." *Id*. Elkins testified that Long used the flyswatters to pass the knife to Cropper through the vent between their cells. Cropper also asked for a right-handed glove, which Long passed through the vent using the same technique. After wrapping a boot lace around the bottom of the knife, Cropper asked Long to spin the lock on his cell. Long complied. Elkins then heard either Long or Howell say, "It's open. Go, go, go."

Landsperger, who had just finished writing a report in the control room for the C and D pods about the items confiscated from Cropper that morning, saw Long playing with the lock on Cropper's cell. When Landsperger heard Long say, "Oh shit," she ordered him to come down and talk with her. As Long was talking to Landsperger, whose back was turned to the control room where Lumley was writing his own report, Cropper escaped from his cell. Cropper went directly to the control room and stabbed Lumley to death with the knife Long had passed to him only a few minutes earlier. All four pods in Building 26 were immediately placed on lockdown.

Brice was in the administration building when the lockdown was ordered. As Brice was walking back to Building 26, Gieslin and Kyzar approached him in the main recreation yard. All three men were detained in a fenced in area outside Building 26 along with other inmates. As Brice, Gieslin, and Kyzar were waiting to reenter the building, they saw Howell, Long, Cropper, and Elkins escorted across the yard in restraints. The guards were yelling at Cropper and crying as they brought him out of Building 26. Brice, Gieslin, and Kyzar also saw an ambulance and helicopter arrive and then leave. Shortly before Brice was removed

from the fenced in area, Kyzar told him to keep his mouth shut.

## B. Procedural History

The State of Arizona charged Kyzar with conspiring to commit a deadly or dangerous assault by a prisoner (Count I); aiding a dangerous or deadly assault by a prisoner (Count II); and promoting prison contraband (Count III).

On September 13, 1999, a Maricopa County jury found Kyzar guilty on Count I, but acquitted him on Counts II and III. After denying Kyzar's motion for a new trial, the trial judge sentenced him to twenty-one years in prison. Kyzar's arguments on direct appeal to the Arizona Court of Appeals were unsuccessful. The Arizona Supreme Court denied Kyzar's petition for review on November 1, 2001.

About one year later, in October 2002, Kyzar filed a *pro se* petition for post-conviction relief arguing, *inter alia*, that the State had not introduced sufficient evidence to convict him of conspiring to commit a dangerous or deadly assault on a prison guard under the standard recently announced in *Evanchyk v. Stewart*, 47 P.3d 1114 (Ariz. 2002). In denying Kyzar's post-conviction petition, the trial court held that *Evanchyk* was "inapposite" to his case. Kyzar renewed his argument based on *Evanchyk* before both the Arizona Court of Appeals and the Arizona Supreme Court, which summarily denied Kyzar's petitions for review on March 24, 2004 and November 9, 2004, respectively. Kyzar's subsequent motion in state court is irrelevant to his sufficiency of the evidence claim.

On August 21, 2006, Kyzar filed a *pro se* federal habeas petition arguing, as its third ground for relief, that the evidence admitted at trial was constitutionally insufficient to support his conviction. The district court, adopting a magistrate judge's report and recommendation, denied Kyzar's habeas petition in its entirety in February 2008. After issuing a certificate of appealability on Kyzar's challenge to the trial court's denial of his motion to sever and his sufficiency of the evidence claim, we vacated in part and remanded only on the latter issue. *See Kyzar v. Ryan*, 430 F. App'x 630 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 431.

On remand, the district court rejected Kyzar's sufficiency of the evidence claim. *See Kyzar v.* Ryan, No. CV 06-2015-PHX-SRB, 2012 WL 5497805 (D. Ariz. Nov. 13, 2012). We granted a certificate of appealability on this issue. *See* 28 U.S.C. § 2253(c)(2).

## II. Exhaustion of Remedies

Respondent's first argument on appeal is that Kyzar failed to exhaust available state remedies because he did not fairly present his sufficiency of the evidence claim to the Arizona courts in a timely fashion. Our review is de novo. *See Chambers v. McDaniel*, 549 F.3d 1191, 1195 (9th Cir. 2008).

Kyzar's claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which requires petitioners to exhaust the remedies available to them in state court. 28 U.S.C. § 2254(b)(1)(A). "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In practical terms,

"state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id*. A habeas claim is procedurally defaulted if it was not fairly presented to the state courts in a timely fashion. *Id*. at 848.

"[E]xcept in habeas petitions in life-sentence or capital cases, claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999) (per curiam). Kyzar was charged with three class 2 felonies under Arizona law: conspiracy to commit a dangerous or deadly assault by a prisoner; aiding a dangerous or deadly assault by a prisoner; and promoting prison contraband.[1] The statutory maximum sentence for a class 2 felony in Arizona is thirty-five years. Ariz. Rev. Stat. Ann. § 13-704(E). Because Kyzar did not face a possible life sentence or the death penalty, our exhaustion analysis focuses on whether he fairly presented his sufficiency of the evidence claim to the Arizona trial court and the Arizona Court of Appeals. *See O'Sullivan*, 526 U.S. at 845 (holding that petitioners must "invoke[e] one *complete round* of the State's established appellate review process" (emphasis added)).

---

[1] *See* Ariz. Rev. Stat. Ann. §§ 13-1206 (categorizing "dangerous or deadly assault by a prisoner" as a class 2 felony), 13-2505(F) (categorizing "promoting prison contraband" as a class 2 felony if contraband is a "deadly weapon" or "dangerous instrument"); *see also id.* at §§ 13-303(B) (subject to qualifications not relevant here, aiding an offense is treated the same as committing the underlying substantive offense), 13-1003(D) (except for class 1 felonies, "conspiracy is an offense of the same class as the most serious offense which is the object of or result of the conspiracy").

"In order to 'fairly present' an issue to a state court, a [habeas] petitioner must 'present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)). "[F]or the purposes of exhaustion, pro se petitions are held to a more lenient standard than counseled petitions." *Sanders v. Ryder*, 342 F.3d 991, 999 (9th Cir. 2003) (citing *Peterson v. Lampert*, 319 F.3d 1153, 1159 (9th Cir. 2003) (en banc)); *see also Slack v. McDaniel*, 529 U.S. 473, 487 (2000) ("[T]he complete exhaustion rule is not to 'trap the unwary *pro se* prisoner.'" (quoting *Rose v. Lundy*, 455 U.S. 509, 520 (1982))).

Applying these principles, we conclude that Kyzar's pro se filings before the Arizona trial court and Arizona Court of Appeals fairly presented his sufficiency of the evidence claim. In his petition for post-conviction relief, Kyzar argued that *Evanchyk* constituted a significant change in Arizona conspiracy law insofar as it required the State to prove "*both* that the perpetrator ha[d] an intent to promote or aid commission of a specific offense and that he agree[d] with another person that the offense be committed." 47 P.3d at 1117. In Kyzar's view, the State failed to prove at trial that he "premeditated an agreement to conspire [sic] dangerous or deadly assault [on] Officer Lumley inside of the prison officers control room or any other officer or person(s) before or on March 7, 1999." Kyzar argued that the absence of evidence showing an agreement violated his due process rights. *Id*.

As a pro se filing, Kyzar's post-conviction petition was adequate to alert the district court to the "substance of his

claim," including its constitutional basis. *Scott*, 567 F.3d at 582. The essence of Kyzar's argument was that the State had failed to prove the elements of his alleged crime. Although Kyzar did not cite *In re Winship*, 397 U.S. 358 (1970), or *Jackson* for the proposition that the Due Process Clause of the Fourteenth Amendment protects him from being convicted unless the State proves every element of the charged offense beyond a reasonable doubt, the substance of Kyzar's claim was apparent from his attempt to articulate the legal elements for the crime of conviction and his explicit reference to due process. Indeed, Kyzar's citation to an Arizona Supreme Court case was entirely consistent with fair presentation of a *Jackson* claim, which necessarily turns on how crimes are defined under state law. *See Jackson*, 443 U.S. at 324 n.16 ("[T]he standard [of review] must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."). The merits of Kyzar's *Evanchyk* claim are irrelevant to the fair presentation issue. Kyzar's pro se filing in the Arizona trial court plainly did enough to "alert[] that court to the federal nature of [his] claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

The same is true of Kyzar's petition for review in the Arizona Court of Appeals. Kyzar argued that "the State never established the grounds and rules outlined in *Evanchyk*…establishing petitioner's agreement to aid or counsel with Leroy Cropper in the assault and murder of Officer Brent Lumley on March 7, 1997." Kyzar conceded that the crime at issue in *Evanchyk* was conspiracy to commit premeditated murder, but characterized the decision as "reinforce[ing]" the "foundational grounds" or elements for the crime of conspiracy under Arizona law. *Id*. Although Kyzar did not mention due process, he cited *State v. Mincey*, 687 P.2d 1180 (Ariz. 1984), in which the Arizona Supreme

Court, citing *Jackson*, held that there was sufficient evidence to support the defendant's second-degree murder conviction. *Id*. at 1187, 1190.   Kyzar's citation to *Mincey*, read in conjunction with his attempt to articulate the legal elements for the crime of conviction, fairly apprised the Arizona Court of Appeals that he was raising a federal constitutional sufficiency of the evidence claim.  *See Peterson*, 319 F.3d at 1158 (holding that "for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue").

In sum, Kyzar fairly presented his sufficiency of the evidence claim to the Arizona courts, which was sufficient to exhaust his state remedies and avoid a procedural default of that claim.

### III. Analysis

We review the district court's rejection of Kyzar's habeas petition claim de novo.  *See Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (en banc).  We apply AEDPA deference to the Arizona Court of Appeals's decision if the *Jackson* claim was "adjudicated on the merits."  28 U.S.C. § 2254(d). "When a federal claim has been [fairly] presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011).  Kyzar has not attempted to overcome the presumption that his claim was adjudicated on the merits in state court, so AEDPA's deferential standards of review govern this case.

Under AEDPA, Kyzar's sufficiency of the evidence claim "face[s] a high bar in federal habeas proceedings because [it is] subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012) (per curiam). First, the Arizona courts were required to view the evidence in the light most favorable to the prosecution and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Second, under AEDPA, we may grant habeas relief only if the Arizona courts "unreasonabl[y] appli[ed]" the already deferential *Jackson* standard, 28 U.S.C. § 2254(d)(1), meaning that their application of law to facts was "objectively unreasonable," *Williams v. Taylor*, 529 U.S. 362, 409 (2000). A state court's application of Supreme Court precedent is objectively unreasonable when it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87.

Under AEDPA, "when a state court does not explain the reason for its decision, we 'look through' to the last state-court decision that provides a reasoned explanation capable of review." *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014) (quoting *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000)). The Arizona Court of Appeals summarily denied Kyzar's petition for discretionary review, so the only possible candidate for a reasoned state court decision capable of review is the Arizona trial court's holding that *Evanchyk* was inapposite to Kyzar's sufficiency of the evidence claim.

The Arizona trial court presumably found *Evanchyk* inapposite because that case defined the elements of conspiracy to commit first-degree murder, whereas Kyzar

was convicted of conspiracy to commit a dangerous or deadly assault by a prisoner.  However, *Evanchyk* also underscored that "the crime of conspiracy requires *both* that the perpetrator have an intent to promote or aid commission of a specific offense and that he agrees with another person that the offense be committed."  47 P.3d at 1117.  After citing *Evanchyk*, Kyzar argued that the State had not established that he "premeditated an agreement to conspire [sic] dangerous or deadly assault [on] Officer Lumley inside of the prison officers control room or any other officer or person(s)."  In other words, Kyzar used *Evanchyk* to argue that the State had failed to prove an essential element of any conspiracy crime: an agreement with another person that a specific offense—here, a dangerous or deadly assault by a prisoner—be committed.

The trial court rejected Kyzar's *Evanchyk* argument, thereby rejecting his fairly presented *Jackson* claim at the same time, but did so without discussing whether the evidence against Kyzar was constitutionally sufficient to support his conviction.  Without a "reasoned explanation" for the trial court's rejection of Kyzar's sufficiency of the evidence claim, we must "'engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable.'"  *Murray*, 745 F.3d at 996 (quoting *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013)).  "Crucially, this [independent review] is not a *de novo* review of the constitutional question."  *Id* (same).  The ultimate question under AEDPA is still whether the Arizona trial court's rejection of Kyzar's claim was an objectively unreasonable application of the *Jackson* standard.

## A. The Evidence Against Kyzar

Our independent review of the record, viewed in the light most favorable to the prosecution, establishes the following. Kyzar and Gieslin shared a cell at Perryville prison and exercised authority over the other white inmates. In fact, Kyzar and Gieslin were the people to see if a white inmate needed a knife, as evidenced by the fact that Kyzar had given Cropper a knife in the past.

On the day of the murder, Cropper threw a tantrum while various items of contraband—including a serrated knife—were confiscated from his cell. After Cropper was placed on lockdown, he asked Long to summon Kyzar and Gieslin. When Kyzar arrived at Cropper's cell, Cropper said he wanted "the good one," meaning a knife with a handle, while making a stabbing motion. After a short discussion about whether Cropper already had the specific knife he was asking Kyzar to obtain for him, Kyzar asked, "Well, are you sure about this? How much time you got, homeboy?" Cropper said, "It don't fucking matter. I'm a career criminal anyway." *Id*. As Kyzar and Gieslin were leaving, Cropper told them to "get off the yard." Kyzar then instructed Brice to show Long, who lived in the cell right next to Cropper, where to find a specific knife that he referred to as "the shank." Kyzar was also present when Gieslin instructed Fipps to go to Long's cell and see if everything was being handled.

After the murder, Kyzar was standing with Gieslin and Brice while they saw Cropper taken out of Building 26 in restraints. The guards who were escorting Cropper were crying and yelling at him. Kyzar turned to Brice and told him to keep his mouth shut.

## B. Sufficiency of the Evidence

The ultimate question is whether, on the facts recounted above, it was objectively unreasonable for the Arizona trial court to deny Kyzar's sufficiency of the evidence claim. We think not.

Kyzar was convicted of conspiracy to commit a dangerous or deadly assault by a prisoner in violation of Ariz. Rev. Stat. Ann. § 13-1206.[2] The elements of this crime come, in part, from Arizona's criminal conspiracy statute, which provides:

> A person commits conspiracy if, with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another, or to commit an offense under § 13-1508 [first-degree burglary] or 13-1704 [arson].

---

[2] Kyzar's acquittal on two other counts—aiding a dangerous or deadly assault by a prisoner and promoting prison contraband—proves nothing about whether the evidence was constitutionally insufficient to support his conviction for a different crime. *See United States v. Powell*, 469 U.S. 57, 67 (1984) (holding that sufficiency of the evidence review "should be independent of the jury's determination that evidence on another count was insufficient").

A.R.S. § 13-1003(A). The object of the alleged conspiracy in this case—i.e., a dangerous or deadly assault—constitutes a "felony upon the person of another," so the State was not required to prove that Cropper, Kyzar, or any other co-conspirator took an overt act in furtherance of their unlawful objective.

Kyzar's habeas claim boils down to whether there was sufficient evidence to find that he: (1) "inten[ded] to promote or aid the commission of [the assault]" and (2) "agree[d] with one or more persons that at least one of them or another person [would commit the assault]." *Id.* The most damaging evidence on these elements is Kyzar's conversation with Cropper about obtaining a knife. The Arizona trial court could reasonably find that the combination of Cropper's stabbing motion and Kyzar's questions—"Well, are you sure about this? How much time you got, homeboy?"—demonstrated that Kyzar knew Cropper intended to assault someone with the knife rather than keep it for possible self-defense. There was also evidence that Kyzar had given Cropper a knife in the past. In light of this history, Kyzar's questions to Cropper could reasonably be construed to suggest that he was concerned about something more serious than Cropper possibly getting caught with prison contraband. Further, Long, whom Cropper sent to summon Kyzar, knew of Cropper's tirade and had said that there needed to be a "fallout." The jury could infer that Long communicated that background to Kyzar before the latter arrived at Cropper's cell and heard his request.[3]

---

[3] As for Cropper's warning that Kyzar and Gieslin needed to "get off the yard," the most we can say about this ambiguous expression is that it does not suggest that Cropper was seeking to obtain a knife for purposes of self-defense.

Knowing that Cropper wanted a knife to assault someone, Kyzar used his authority over the other white inmates to enlist Brice in the effort to help Cropper obtain a specific knife—i.e., a shank that Cropper and Kyzar understood to be "the good one" because it had a handle. Kyzar was also present when Gieslin asked Fipps to see if everything in Long's cell was being handled. A jury could reasonably find that Kyzar knew what was supposed to be happening in Long's cell. After all, Kyzar had set in motion a plan for Long to obtain a knife shortly after Cropper said he wanted one and, the jury could infer, had an opportunity to hear the background circumstances from Long.

Kyzar's comment to Brice while they were waiting to reenter Building 26 after the murder also provides evidence from which the jury could infer that Kyzar knew Cropper wanted a knife to harm someone rather than simply for self-defense. Guards who were crying and yelling at Cropper as he and three other inmates were taken out of Building 26 in restraints. Kyzar reacted to these events by telling Brice to keep his mouth shut. The jury could infer from Kyzar's statement that he knew his earlier instruction to Brice to help Long find a knife was part of a larger plan connected to Cropper that had come to fruition.

On these facts, the Arizona trial court did not apply *Jackson* in an objectively unreasonable fashion when it rejected Kyzar's sufficiency of the evidence claim. The State presented evidence at trial suggesting that Kyzar knew Cropper intended to attack someone, agreed to help him obtain a knife, and even took an overt act in furtherance of this conspiracy. Kyzar was more than merely present while other inmates engaged in criminal activity, so his reliance on

*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001), is misplaced.

After reviewing the full trial record, we cannot say that Kyzar's sufficiency of the evidence claim was so meritorious that, by rejecting it, the Arizona trial court committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87; *see also Williams*, 529 U.S. at 410 (emphasizing that "an *unreasonable* application of federal law" is a more serious error than "an *incorrect* application of federal law"). Therefore, under AEDPA, Kyzar is not entitled to habeas relief.

* * * * *

**AFFIRMED.**