**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr><td>

TERRY D. BEMORE,
          *Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
          *Respondent-Appellee*.

</td><td>

No. 12-99005

D.C. No.
3:08-cv-00311-
LAB-WVG

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
September 10, 2014—San Francisco, California

Filed June 9, 2015

Before: Stephen Reinhardt, Ronald M. Gould,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's denial of habeas corpus relief on California state prisoner Terry Bemore's claim that his counsel was constitutionally ineffective at the guilt phase, reversed the district court's denial of habeas relief with respect to Bemore's penalty phase ineffective-assistance claim, and remanded.

Regarding Bemore's argument that counsel fraudulently misappropriated and diverted court-issued funds supplied to the defense thereby creating a conflict of interest, the panel held that without a showing that counsel's misuse of funds caused him to investigate less thoroughly than he otherwise would have, Bemore has not established any constitutional deprivation under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

The panel held that counsel provided constitutionally deficient representation at the guilt phase by presenting a weak alibi defense after failing to investigate either that defense or a mental health alternative. The panel concluded, however, that Bemore did not suffer the requisite prejudice to the guilt verdict as a result, and that the California Supreme Court's rejection of this guilt-phase claim was not an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 674 (1984).

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that counsel provided constitutionally deficient representation at the penalty phase in that counsel's early decision to pursue a risk-fraught "good guy" mitigation strategy did not satisfy her duty first to unearth potentially mitigating mental health evidence. The panel held that in deferring to counsel's decision not to pursue a mental health mitigation case despite counsel's unreasonable investigation, the California Supreme Court unreasonably applied *Strickland*. The panel concluded that Bemore was so substantially prejudiced by the constitutionally deficient deprivation of adequate representation at both stages that it was unreasonable for the state court to have left the death penalty in place. The panel wrote that mitigation mental health evidence, combined with a different guilt phase strategy, might well have influenced the jury's appraisal of Bemore's moral culpability, and that the state court's contrary conclusion constituted an unreasonable application of *Strickland*.

With regard to the guilt phase ineffective-assistance claim, the panel held that the district court did not abuse its discretion in denying Bemore's motion for an evidentiary hearing and discovery. With regard to the penalty-phase ineffective-assistance claim, the panel wrote that its conclusion that declarations and other evidence already in the record support Bemore's claim obviates any need to remand for discovery.

The panel remanded to the district court with instructions to grant the petition for a writ of habeas corpus with respect to the penalty phase and to return the case to the state court to reduce Bemore's sentence to life without parole, unless the state elects to pursue a new capital sentencing proceeding within a reasonable amount of time as determined by the district court.

The panel addressed Bemore's other asserted grounds for relief in a concurrently filed memorandum disposition.

## COUNSEL

Robert R. Bryan (argued) and Cheryl J. Cotterill (argued), Law Offices of Robert R. Bryan, San Francisco, California, for Petitioner-Appellant.

Holly D. Wilkens (argued), Supervising Deputy Attorney General; Kamala D. Harris, Attorney General; Julie L. Garland, Senior Assistant Attorney General; Robin Urbanski, Deputy Attorney General, San Diego, California, for Respondent-Appellee.

## OPINION

BERZON, Circuit Judge:

Terry Bemore was sentenced to death for the murder of Kenneth Muck, a employee at Aztec Liquor in San Diego. His co-defendant, Keith Cosby, was tried by a separate jury and sentenced to twenty-five years to life for the same crime. Bemore seeks habeas relief on the grounds that his trial lawyers were constitutionally ineffective for: presenting a flawed alibi defense; failing to challenge the torture special circumstance; presenting no evidence of mental impairments at the guilt phase or penalty phase; and creating a conflict of interest by diverting state-paid defense funds for personal

use.[1] *See Strickland v. Washington*, 466 U.S. 674 (1984).  We hold that counsel provided constitutionally deficient representation at the guilt phase, but Bemore did not suffer the requisite prejudice to the guilt verdict as a result.  With regard to the penalty phase, however, Bemore was both deprived of the representation guaranteed by the Sixth Amendment and so substantially prejudiced by the constitutionally deficient deprivation of adequate representation at both stages that it was unreasonable for the state court to have left the death penalty in place.

We therefore affirm in part, as to the district court's denial of the habeas corpus petition challenge to Bemore's conviction for murder.  We reverse in part, as to the district court's denial of the habeas petition with regard to the penalty phase claim.

## I. BACKGROUND

### A. The Crime

Around 10:00 pm on August 26th, 1985, Kenneth Muck was ending his shift as a clerk at Aztec Liquor.  Before locking up for the night, Muck was supposed to set a burglar alarm and transfer cash from the store register to a safe in a back-room storage area.  At some point after 10:15 pm, the security company that monitored the alarm system called Aztec's owner to notify him that the alarm had not yet been set.  The owner sent an employee to check on the store.  The

---

[1] In addition to his ineffective assistance of counsel claims, Bemore raises several other grounds for habeas relief.  We address them in a memorandum disposition filed concurrently with this opinion.

employee walked in, saw blood near the storage room, fled, and immediately called the police.**²**

The police found Muck dead on the floor of the storage room, stabbed thirty-seven times. The safe was gone. Smeared blood and striation marks on the floor indicated that the safe had been tipped onto a mop and pushed or dragged out the door. Officers noted two sets of bloody footprints, one of which, an expert determined, was made by men's size thirteen tennis shoes.

Two months after the robbery and murder, a local TV show, *Crime Stoppers*, ran a segment seeking information about the Aztec crimes. Patti Hill, girlfriend of Bemore's friend Jackie Robertson, contacted *Crime Stoppers* and conveyed her suspicion that Bemore and his friend Keith Cosby were involved. She provided to the police several money bags and a knife Bemore had left in Hill and Robertson's apartment, as well as a mop Bemore had thrown into a dumpster. The owner of Aztec Liquors identified the mop and money bags as identical to those stolen from the store.

Not long afterwards, Cosby was driving Bemore's car and crashed it into someone's yard. Cosby was taken into custody, and a detective obtained a warrant to search the car.

---

**²** Interviews with area residents confirmed that Muck was killed sometime around 10:00 pm. A neighbor had visited the store between 9:30 and 9:45 pm to return a plunger he had borrowed and had a casual conversation with Muck. He found nothing amiss. That neighbor also reported seeing a car outside the store matching the description of Bemore's car, a maroon Buick Electra 225 with several visible missing parts, including hubcaps and the front license plate. Another neighbor testified that she and her boyfriend looked out their bedroom window between 9:45 and 10:00 pm and saw two strangers standing outside a "medium to large-sized sedan-type" car behind the liquor store.

Found in the trunk during the search were two knives and two pairs of shoes, size twelve or thirteen. Cosby eventually admitted he was at Aztec Liquors the night of the robbery, but told police Bemore had committed the murder while he waited outside.

Cosby and Bemore were both charged with first degree murder (Cal. Pen. Code § 187), robbery (Cal. Pen. Code § 211), and burglary (Cal. Pen. Code § 459), along with two special circumstances: murder in the commission of a robbery and intentional murder involving torture. The trials were severed; Cosby went to trial first. He was convicted of both Aztec crimes and also of another murder-robbery, tried concurrently. With respect to the Aztec murder, the jury did not unanimously find true the special circumstances of torture and murder in the commission of a robbery. Cosby was sentenced to twenty-five years to life for Muck's murder.

## B. Trial - Guilt Phase

Bemore was then tried separately. The prosecution centered its case on the testimony of residents of the Bates Street neighborhood who knew Bemore. Bates Street was known to be "a marginal neighborhood whose inhabitants generally knew one another and were involved in the sale and use of crack cocaine." *People v. Bemore*, 22 Cal 4th. 809, 821 (2000). Taken together, the Bates Street residents testifying at trial placed Bemore on Bates Street the night of the murder, wearing shoes similar to the size thirteen sneakers whose footprints were left at the crime scene, and with fresh scratches on his back.[3] Bemore's friends Troy

---

[3] Bemore alleges that the prosecution withheld or allowed to go uncorrected evidence pertaining to impeachment of many of these witnesses in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959). We conclude, however, in the

Patterson and Jackie Robertson admitted to helping Bemore and Cosby drill a hole in the stolen safe. Several witnesses testified that Bemore had made statements to them implicating himself in Muck's murder.

In support of the torture special circumstance allegation, the prosecution's expert witnesses testified about the circumstances and details of the murder. The forensic pathologist who performed the autopsy, for example, concluded that Muck was likely restrained for some period of time during the attack. He opined that at least two knives were used to cause the thirty-seven wounds and that both knives recovered from Bemore's trunk were consistent with at least some of the wounds. A crime scene reconstructionist concluded using blood spatter patterns that fifteen to thirty minutes passed from the initial assault to the last blow.[4] At closing argument, the prosecution suggested that the evidence indicated that Bemore and Cosby had restrained and tortured Muck for the purpose of "forc[ing] [him] to open up the safe."

The defense, led by appointed counsel Robert McKechnie, presented few witnesses, relying primarily on Bemore's own testimony. Bemore's primary defense was a novel alibi.

---

memorandum disposition filed concurrently with this opinion that, applying AEDPA's stringent standards, it would not have been unreasonable for the state court to deny those claims because Bemore was not prejudiced.

[4] The defense made little effort to challenge the prosecution's forensic experts. We find it unnecessary to reach Bemore's IAC claim on that matter. *See infra* note 18.

According to Bemore, he was committing another robbery at the time of the Aztec crimes. Bemore told the jury that at approximately 9:00 pm on the evening of Muck's death, he, Patterson, and Cosby drove to a K-Mart to case it for a robbery. While he was inside, Patterson and Cosby took off in his car. Left with no car and no cash, Bemore walked to a nearby Wherehouse Records store and robbed one of the clerks. He then got into a cab and went to buy cocaine, eventually returning to Bates Street to smoke the cocaine and to buy more.

Some (unspecified) time later, Bemore went on, he saw Cosby and Patterson drive past in his car with a blood-covered safe in the backseat. He helped his friends carry the safe to his garage, assisted them in opening it, and convinced them to give him a share of the money inside. Despite the earlier testimony of several Bates Street residents that Bemore had implicated himself in the murder, Bemore firmly denied knowing anything about it.

On cross-examination, the alibi broke down. Twice Bemore referred to Wherehouse Records—the store he claimed to have robbed—as "Wherehouse Liquor." He couldn't remember which direction he had walked to get from K-Mart to Wherehouse Records; why he had chosen to rob Wherehouse Records over all the other stores he had passed along the way; or whether he had intended to rob the Wherehouse Records store when he walked into it. He couldn't remember whether there had been people in the store when he pointed the gun at the cashier or whether any of the employees had said anything to him during or after the robbery. Nor could he remember several other aspects of the robbery, including what he said, how he handled the gun, and

how much money he took. He seemed to have forgotten factual details he had given in his direct testimony.[5]

Two witnesses to the Wherehouse Records robbery had identified Bemore as the robber at a preliminary hearing.[6] To corroborate Bemore's alibi at trial, counsel called the two as witnesses. One—the cashier, Yolanda Salvatierra—this time was not sure whether Bemore was the robber, and said she had in fact been unsure when she identified Bemore at the preliminary hearing. Both at trial and at the preliminary hearing, she described the robber as "muscular" and six-foot-two or six-foot-three. Bemore was six-foot-six, and he was thin both at the time the crimes occurred and at trial.

Carrie Jacobs, the second Wherehouse Records robbery witness who had identified Bemore at the preliminary hearing, was unavailable at trial. Her testimony from the preliminary hearing was read to the jury. Although she had identified Bemore out of a lineup after the crime, Jacobs wasn't sure at the preliminary hearing that Bemore was the person she had earlier identified; she "couldn't . . . definitely say" that he was. Like Salvatierra, she remembered the robber as muscular and about six-foot-one, and she thought he was "possibly . . . darker" than Bemore. She reported that she had gotten only a fleeting glance at the Wherehouse

---

[5] In his direct testimony, for example, Bemore said that he had approached a Wherehouse Records clerk and told her he was going to retrieve his checkbook from his car; he then left the store briefly, returned, and robbed the clerk at gunpoint. On cross-examination, the prosecutor asked him, "You said something about a checkbook earlier?" Bemore responded "I said something about a checkbook?"

[6] Bemore was initially charged with fourteen other robberies and three counts of assault in addition to the Aztec robbery. After a preliminary hearing, the magistrate held Bemore to answer for only the Aztec crimes and a few others; the others were later dismissed.

Records robber, who otherwise had his back to her the entire time.

On rebuttal, the prosecution called a third eyewitness, Kim Rainer, an employee who was with Salvatierra when the store was robbed. Immediately following the robbery, Rainer described the perpetrator as a muscular black man of about Bemore's height. At both the preliminary hearing and at trial Rainer said her initial descriptions were incorrect—perhaps due to her distress at the time—and that the robber was actually shorter than Bemore and had lighter skin. She stated that she could not positively identify Bemore as the robber of the Wherehouse Records store.

Also on rebuttal, investigator Richard Cooksey testified, further calling into question Bemore's description of the Wherehouse Records robbery. According to Cooksey, a parking structure mentioned in Bemore's testimony did not exist at the time of the crime, and the distance from K-Mart to Wherehouse Records was longer than Bemore said it was. Crucially, Cooksey also testified that when he had driven from Wherehouse Records to Aztec Liquors, obeying all traffic laws, the travel time was just over sixteen minutes—meaning that even if Bemore had committed the Wherehouse Records robbery at 9:00 pm, he could easily have arrived at Aztec before Muck's murder, which occurred around 10 pm.

The jury returned a verdict of guilty on all counts. The jury also found true the special circumstances of murder during the commission of a robbery and murder involving the infliction of torture.

## C. Trial-Penalty Phase

The trial then proceeded to a penalty phase before the same jury.  The prosecution's penalty phase case centered on testimony that Bemore had committed two prior, unadjudicated offenses.

Zelda C., who formerly lived on Bates Street, testified that one night, after she hosted a group of people in her apartment to smoke cocaine, Bemore raped her.  Zelda did not tell the police about the rape at the time, but two of her sisters testified that she called them the morning after the incident and told them about the rape.  (The judge admitted Zelda's statements to her sisters, over the defense's objection, as excited utterances.)  Lloyd Howard, who sold drugs to Bemore and many other Bates Street residents, and who had invited Bemore to Zelda's house the night of the rape, testified that Zelda also told him about the rape the following morning.

As to the second prior unadjudicated offense, Kevin Oliver ("Oliver") and his wife, Jacqueline Oliver, testified about an altercation with Bemore in which Bemore pointed a gun at Oliver and hit him over the head with a wine bottle.  Bemore and Oliver were both taken to the hospital.  Oliver testified that he overheard Bemore, who was being treated next to him, say aloud that he planned to kill Oliver's children.

McKechnie's co-counsel, Elizabeth Barranco, led the penalty phase presentation for the defense.  In preparation, Barranco had hired forensic psychologist Dr. Kenneth Fineman to evaluate Bemore.  Barranco had recently read an article of Dr. Fineman's describing his theory regarding "sun children"—minority children from poor homes who, because of their talents, become immersed in affluent white society,

but then subsequently act out and, due to the psychological stress of having to live in two different worlds, begin using drugs. Barranco hoped that Bemore, an African-American and former star basketball player recruited to play at several colleges, might fit this diagnosis. Her mitigation strategy was to present Bemore as "a good guy with a drug problem."

Barranco sent Bemore for four days of psychological testing with Dr. Fineman. When Dr. Fineman's report came back, Barranco was surprised and "angry" that the report made no mention at all of the "sun children" theory. Instead, Dr. Fineman reported that Bemore suffered from a number of psychological conditions, including "mild, diffuse organic brain impairment"; attention-deficit disorder; and poor impulse control resulting in "a fundamental inability to control his behavior" when his "needs press upon him." He also stated that Bemore "can be quite hostile, explosive and aggressive[,] . . . [and] seldom takes into account the impact his actions are likely to have on others." Based on his findings, Dr. Fineman named several "diagnostic considerations," including "bi-polar affective disorder," "intermittent explosive disorder," and "anti-social personality disorder."

Dr. Fineman approached Barranco and recommended further testing to complete a mental health diagnosis. Barranco did not have Dr. Fineman or any other mental health professional follow up. Instead, convinced that Dr. Fineman's report conflicted with her "good guy" defense strategy, she placed the report "in the back of a file drawer." She did not show it to or discuss it with Bemore, and there is no evidence in the record before us that she showed it to her co-counsel.

Rather than further investigating a mental health mitigation strategy, Barranco went forward with her

previously chosen "good guy" mitigation plan. She called over 40 witnesses to testify to Bemore's personal history and good character. Many of the witnesses knew him through high-school and college basketball and described him as a good player and kind person. Some did not believe Bemore used drugs; others said he became addicted to drugs and alcohol after his mother died. Several witnesses described him as a deeply religious person and related that he had at one time attended ministry school. Bemore's wife testified that Bemore had expressed remorse for putting his family through the ordeal of the trial. And a number of inmates, correctional officials, and other jail personnel described Bemore as obedient, religious, and a role model for other inmates.

On a different topic, Bemore's childhood family life, Bemore's half-brother Kenneth Daugherty testified that he and Bemore, along with two other half-brothers, were raised by a drug-abusing caretaker while their mother was ill with severe rheumatoid arthritis. The caretaker physically abused the children by hitting them with a cane and with an extension cord. One of Bemore's other brothers testified that as a child, Bemore, the youngest of the four brothers, was sometimes recruited to act as lookout while his brothers committed burglaries. Dr. Bucky, a clinical psychologist, testified that children like Bemore who grow up with substance-abuse problems in the home are likely to develop their own chemical dependencies in the future.

On rebuttal, the prosecution concentrated on Bemore's behavior in jail. Several witnesses, painting a different picture than Barranco had presented, testified that Bemore used threats and intimidation to obtain drugs, cigarettes, and other scarce commodities while incarcerated. Some of these witnesses, and others, maintained that his religiosity was a pretense, contrived to obtain favorable testimony at trial. A few said Bemore was physically violent. On surrebuttal, a

group of inmates testified that the inmates who had testified against Bemore regarding his behavior in jail did so to retaliate against him because he did not tolerate their disciplinary infractions, but, instead, disposed of their drugs and intervened in their fights.

Inmates and officials also described a "food-tampering" incident they said Bemore had masterminded. Bemore, they said, intentionally contaminated one evening's dinners, expecting that a large group of inmates would be taken to the hospital and some might be able to escape. The plan succeeded in sending many inmates to the hospital. None escaped.

After considering all the penalty phase evidence, the jury sentenced Bemore to death.

### D. Procedural History

Judge Gill (who had previously presided at Cosby's trial) denied Bemore's motions for a new trial and a modification of his sentence. The California Supreme Court affirmed the conviction and sentence. On June 19, 2000, Bemore filed a habeas petition directly with the California Supreme Court.[7] Seven years later, the court summarily denied all claims on the merits without an evidentiary hearing.

Bemore then filed a timely writ of habeas corpus in the district court for the Southern District of California. The court refused to hold an evidentiary hearing on any of Bemore's claims and denied relief on all claims. A final

---

[7] Bemore's current counsel has represented him throughout his state and federal habeas proceedings.

order and Certificate of Appeal were issued on September 25, 2012.

## II. DISCUSSION

### A. Standard of Review

We review a district court's denial of a petition for writ of habeas corpus de novo. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). Because Bemore's petition was filed in the district court after the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective, we may grant relief only if the last state court merits decision was "'(1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court . . . ; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003) (quoting 28 U.S.C. § 2254(d)). For relief to be granted, a state court merits ruling must be "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Here, on direct appeal, the California Supreme Court issued a reasoned ruling on the narrow claim that counsel was ineffective for presenting "good inmate" evidence at the penalty phase. *Bemore*, 22 Cal. 4th 809, 847–853 (2000). On habeas, the California Supreme Court summarily denied Bemore's broader ineffective assistance of counsel ("IAC") claims without analysis or citation to authority. In determining whether the California Supreme Court's decision to deny habeas relief concerning the "good inmate" evidence IAC claim was reasonable, we apply AEDPA deference to the state court's analysis. *See Cannedy v. Adams*, 706 F.3d 1148,

1156–59 (9th Cir. 2013). For claims that the state court did not expressly address, including penalty-phase IAC claims not limited to the "good inmate" evidence, we conduct an independent review of the record to "determine what arguments or theories . . . could have supported[] the state court's decision." *Richter*, 562 U.S. at 102. We then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a . . . decision of th[e] [Supreme] Court." *Id.*

## B. Conflict of Interest: Misuse of Defense Funds

Bemore argues, first, that lead counsel McKechnie fraudulently misappropriated and diverted court-issued funds supplied to the defense, thereby creating a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).[8] Relying on a declaration by Barranco,[9] Bemore claims that despite the $145,851.81 paid to lead investigator Charles Small—a sum totaling nearly half the defense budget—"little [to] no work was . . . done" by Small. Assertedly, McKechnie knew

---

[8] Bemore's briefing categorizes this contention as an IAC claim but analyzes the issue as a conflict of interest claim governed by *Cuyler*, not *Strickland*. If otherwise made out, a *Cuyler* claim can succeed without proving that there is a reasonable probability that the alleged conflict affected the outcome of the trial, as required under *Strickland. See Strickland*, 466 U.S. at 694; *Cuyler*, 446 U.S. at 348. Bemore has, accordingly, not argued that the alleged conflict-of-interest IAC would satisfy the *Strickland* standard for prejudice.

[9] We refer throughout to Barranco's declaration dated June 12, 2000. Barranco has since submitted three other declarations. Those three declarations were not before the California Supreme Court, so we may not consider them here. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). We deny Bemore's motion for a stay and abeyance to present the late-submitted declarations to state court, as he has not made the requisite showing of good cause for not having presented them earlier. *See Gonzales v. Wong*, 667 F.3d 965, 980 (9th Cir. 2011).

of Small's fraudulent billing but continued to pay him for work not performed because Small knew that McKechnie had cheated on his wife during a business trip, and McKechnie was afraid Small would reveal that information if he refused to pay him.   Bemore also suggests that McKechnie encouraged defense specialists to bill for more hours than they actually spent on the case, and that he billed for hours worked by a law clerk who later insisted that he had "never spent so much as one minute on the case."   That money, Bemore alleges, paid for McKechnie's gambling habit and his "lavish lifestyle; e.g., his new law office and his expensive home."

Troubling as these allegations are, Bemore has not shown that the asserted financial improprieties support a *Cuyler* claim.  To make out such a claim, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348.

Here, it is questionable whether the allegedly padded bills, without more, could demonstrate an actual conflict of interest.  Although Bemore repeatedly refers to McKechnie's conduct as fraudulent, a violation of an ethical duty or standard of professional conduct does not create a conflict of interest absent a showing that the violation "actual[ly] . . . impaired [counsel's] ability to effectively represent" his client. *United States v. Nickerson*, 556 F.3d 1014, 1019 (9th Cir. 2009).  And while a conflict of interest claim "*may in theory* lie where an attorney's financial interests are in conflict with his client's interests," *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995) (emphasis added), without evidence that the available defense funds were run dry, overcharging the court—even fraudulent overcharging—has no inherent tendency to dissuade counsel from loyalty to his

client where it counts: in the investigation and presentation of the case.

Further, even if we were to conclude that McKechnie's use of funds did create an actual conflict of interest, Bemore has not shown that any such conflict affected McKechnie's performance. Bemore acknowledges that there was no "lack of funding" or "insufficient funds" for his defense. Court disbursement lists show that eight individuals listed as experts *were* employed and received defense funds, and that, in addition to Small, seven investigative firms were paid small sums to conduct forensic investigation. The accusations of fraud may bolster Bemore's other IAC claims by negating, for example, any inference that the amount of time and money spent indicates that McKechnie's decisions were carefully considered and researched. But without a showing that McKechnie's misuse of funds caused him to investigate less thoroughly than he otherwise would have, Bemore has not established any constitutional deprivation. *See Cuyler*, 446 U.S. at 348.

## C.  IAC: Guilt Phase

We turn now to Bemore's claim that McKechnie offered ineffective assistance at the guilt phase by (1) presenting an "unprepared, uncorroborated, and uninvestigated" alibi defense, and (2) failing to investigate and present evidence of mental impairment that could have negated Bemore's culpability. As we shall develop, the two subissues are closely related.

To prevail on a *Strickland* ineffective assistance of counsel claim, a defendant must establish that counsel's performance was deficient and that he was prejudiced. *Strickland*, 466 U.S. at 687–88. Counsel is deficient where he makes errors so serious as to deny the defendant the

"counsel" guaranteed by the Sixth Amendment—where he fails to offer "reasonably competent" assistance as measured by "prevailing professional norms." *Id.* Reversal is warranted only if the defendant can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

A federal court applying AEDPA on habeas review must ask whether the state court was unreasonable in its application of *Strickland*, a question "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

**1.** *Investigation and preparation of the alibi and alternative defenses*

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate is flexible, and not "limitless." *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995) (quoting *United States v. Tucker*, 716 F.2d 576, 584 (9th cir. 1983)). Also, a tactical decision may constitute constitutionally adequate representation even if, in hindsight, a different defense might have fared better. *See id.*; *Reynoso v. Giurbino*, 462 F.3d 1099, 1113 (9th Cir. 2006).

McKechnie's investigation of defenses, we conclude, was so deficient as to fail these forgiving standards. Whether performance was deficient is a fact-specific inquiry; "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances

faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89. Prevailing professional norms do, however, provide insight into what it means to provide reasonably competent assistance. *See Bobby v. Van Hook*, 558 U.S. 4,7 (2009).

Bemore was charged in 1985 and tried in 1989. During that period, "the prevailing professional norms, as outlined by the ABA Standards, required that a lawyer 'conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . . .'" *Doe v. Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (quoting *Van Hook*, 588 U.S. at 7, 11) (internal alterations omitted).

McKechnie's investigation and preparation of the alibi defense did not meet this standard. The extent of McKechnie's investigation was, apparently, reviewing police reports of the Wherehouse Records robbery and cross-examining at the preliminary hearing three eyewitnesses to that crime.[10] McKechnie did not take steps to investigate the plausibility of the alibi by researching the timeline and geography to which Bemore planned to testify. He did not interview the eyewitnesses at all after the preliminary hearing, even though the trial was three years later. And the first and only time McKechnie met with Bemore to prepare the alibi testimony was the night before Bemore was to take the stand. Yet, Bemore's alibi was the entire defense.

---

[10] As indicated earlier, financial records show checks for "investigation" services made out to several payees, but the record does not indicate, and the state has not attempted to explain, what, if any, work was done. Any inference that productive work must have been completed is diminished by the allegations of fraudulent billing.

Because he expended such minimal effort, McKechnie did not learn of several critical flaws in the alibi presented.

First, especially given the alibi's central importance, McKechnie's decision minimally to prepare Bemore, the primary alibi witness, was professionally unacceptable. *See Alcala v. Woodford*, 334 F.3d 862, 890 (9th Cir. 2003) (holding that failure to prepare a witness to testify "could [not] possibly 'be considered sound trial strategy'" (quoting *Strickland*, 466 U.S. at 689)). Bemore was so unprepared that he could not supply basic facts about the crime, forgot his own direct testimony on cross, and testified to details easily disproved by investigator Cooksey's rebuttal testimony.[11] The discrepancies in Bemore's testimony were so obvious that, in his closing argument, the prosecutor presented a chart comparing Bemore's testimony on direct and cross-examination, telling the jury, "two people testified for the defense in this case. They were both named Terry Bemore."

Second, investigation into the geographical layout of Wherehouse Records and its surroundings would have revealed that the account Bemore provided on the stand rested in part on geographical features that were not there when the crime was committed.

Third, and critically, a rudimentary investigation also would have demonstrated that it was possible for the same perpetrator to have committed both the Wherehouse robbery at 9:00 pm and the Aztec robbery and murder at 10:00 pm. Indeed, as McKechnie was aware from the preliminary hearing, the state initially charged, and the preliminary

---

[11] McKechnie not only failed to prepare Bemore to testify, according to Barranco, but also rattled Bemore just before he took the stand by leaning over and whispering, "'Just don't act like a nigger' or words to that effect."

hearing magistrate judge found probable cause for, both crimes. In other words, the inherently risky "I was committing a different robbery" alibi was not really an alibi, as Bemore could have both committed that robbery *and* committed the murder. Bemore did testify to his whereabouts *after* the Wherehouse robbery, but that account was entirely uncorroborated, lacking in detail, and self-contradictory.

Finally, McKechnie's decision not to interview before trial the key eyewitnesses likewise contributed to the large gap in defense counsel's pretrial information regarding the viability of the alibi. Such interviews could have revealed that one witness McKechnie planned to present to corroborate the alibi would recant. In light of Jacobs's unavailability at trial, Salvatierra's changed testimony meant that there was not a single witness testifying live before the jury who placed Bemore at Wherehouse Records. And Jacobs's testimony, read to the jury by Barranco, was wavering, as she stated that she did not remember whether Bemore was the person she identified in a lineup after the Wherehouse Records crime; Jacobs thought the robber "might have been darker" than Bemore; and she indicated that, although Bemore's face looked like what she remembered of the robber's, she saw the robber's face only "for an instant."

Counsel's duty to investigate and to prepare his client's defense becomes "especially pressing where . . . the witnesses and their credibility . . . are crucial." *Reynoso*, 462 F.3d at 1113. That is the case with regard to a lawyer's decision whether to discourage his client from presenting an uncorroborated, implausible alibi theory, *see Johnson v. Baldwin*, 114 F.3d 835, 840 (9th Cir. 1997), particularly in a capital case, where a penalty phase will follow. In that circumstance, it may well be preferable for the defendant not to take the stand where his alibi is weak, "thereby depriving the jury of [an] adverse credibility determination" that could

greatly undermine the jury's sympathy for him at the penalty phase. *Id.*; *see Florida v. Nixon*, 543 U.S. 175, 181 (2004).

The state maintains that these precepts are not pertinent here, as it was Bemore's idea to present the alibi.[12]  But even if the alibi was suggested by Bemore, counsel cannot neglect to investigate both the possible alibi and alternative defenses. "Although a defendant's proclamation of innocence . . . may affect the advice counsel gives," it "does not relieve counsel of his normal responsibilities under *Strickland*."  *Burt v. Tallow*, 134 S.Ct. 10, 17 (2013).

We are not suggesting that, had McKechnie made an informed decision to present an imperfect, but well-prepared alibi, rather than a weak alternative defense (or no defense), that would necessarily have been deficient performance. *See Strickland*, 466 U.S. at 689.  But, as we develop later, in a capital case, the choice of guilt phase defense involves strategic decisions as to both the guilt and penalty phases. "[C]ounsel can hardly be said to have made a strategic choice when s/he has not yet obtained the facts on which such a decision could be made." *Reynoso*, 462 F.3d at 1113 (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994)) (alteration omitted).  "This is not a case where counsel 'could not have predicted just how damaging placing [the defendant] on the stand would be.'" *Hernandez v. Martel*, 824 F. Supp. 2d 1025, 1091 (C.D. Cal. 2011) (quoting *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005)) (alterations in original).  With adequate investigation, McKechnie could have made an appropriate strategic choice and then competently advised Bemore as to whether to take the stand,

---

[12] Bemore, by contrast, contends that McKechnie contrived that plan. We need not address that disagreement.  As we explain, regardless of whose idea the alibi was, McKechnie was obliged to investigate it.

given the available alternatives. McKechnie, however, failed to conduct a reasonable investigation, nor did he make a reasonable decision rendering investigation unnecessary. *See Strickland*, 466 U.S. at 691. Instead, McKechnie essentially abdicated his role as a lawyer in developing the principal defense. His failure adequately to investigate before putting on an alibi that was not really an alibi was constitutionally inadequate even under our "doubly deferential" review. *Richter*, 562 U.S. at 104.

Moreover, and notably, a potentially "viable alternative defense"—a mental health defense—was quite possibly available, yet McKechnie did not investigate that defense, either. *Phillips v. Woodford*, 267 F.3d 966, 976 (9th Cir. 2001). The "deference owed [to] strategic judgments" to pursue one trial strategy and not an alternative is "defined . . . in terms of the adequacy of the investigations supporting those judgments." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Medical expert reports and statements by Bemore's family and friends, all known or readily available to McKechnie at the time, evinced a possibility that Bemore was so mentally impaired as to be unable to form the requisite intent to commit the crimes. Dr. Fineman, hired by co-counsel Barranco to conduct an investigation for the penalty phase, issued an eighteen-page report a year before the trial began indicating that Bemore suffered from, among other mental defects, organic brain impairment and a "fundamental inability to control his behavior." There was a possibility that Bemore had some form of mental illness, including bipolar disorder.[13] According to Dr. Fred Rosenthal, a psychiatrist

---

[13] There is no indication in the record before us that McKechnie was aware of the report. McKechnie led the guilt phase of the trial, and Barranco the penalty phase, with minimal overlap in their duties. Barranco stated that she placed the report "in the back of a file drawer" upon reading it.

hired by habeas counsel, bipolar disorder causes manic phases in which the individual "will become . . . impulsive, have lapses in judgment, and can even become psychotic." Intermittent explosive disorder, another of the possibilities Dr. Fineman mentioned, causes episodes that "often resemble epileptic seizures" in which "the individual [may] engage in sudden violence and then have no memory of his actions when the episode ends."

Dr. Fineman's declaration states that he "informed trial counsel of the test results and advised that a guilt-phase defense of diminished capacity was possible in this case, but recommended that further development was necessary."[14] No follow-up was ever conducted.

---

McKechnie's unawareness of the report—if he was so unaware—does not absolve him of his investigative duties or undermine the IAC claim with regard to the defense team as a whole. In *Wiggins*, the Court held that an investigation into a defendant's background was deficient where counsel failed to uncover details about the defendant's social history that were easily obtainable in "state social services, medical, and school records." 539 U.S. at 516. Here, with minimal coordination between counsel, McKechnie should have been aware that Dr. Fineman had been engaged and that a report was in existence, and he should have read the report.

[14] California's diminished capacity defense had been abolished several years before Muck's murder. *See* Cal Penal Code § 25 (1982). Dr. Fineman's suggestion of a diminished capacity defense was therefore in error. But, although a criminal defendant on trial in California in 1989 could not use evidence of his mental health issues to demonstrate that he "*could* not" entertain the requisite mental state to commit the crime, and could not present evidence of insanity at the guilt phase, he nevertheless could introduce mental health evidence not rising to the level of insanity to demonstrate that "he *did* or *did not*" in fact possess the requisite mens rea. *People v. Elmore*, 59 Cal. 4th 121, 142–44 (2014) (quoting *People v. Wells*, 33 Cal. 2d 330, 350 (1949), *superseded by statute as stated in People v. Saille*, 54 Cal. 3d 1103 (1991)); *see also Saille*, 54 Cal. 3d at 1116–17.

McKechnie was also on notice that a number of Bemore's family, friends, and acquaintances had described Bemore as having an erratic and "crazy" temperament. Transcripts of pre-trial interviews with several government witnesses reported that Cosby had described Bemore's behavior during and after the killing as "crazy," "frenz[ied]" and "berserk." Another witness warned that Bemore was generally a calm, quiet person, but that he occasionally went into violent fits, "like a raging bull."

Finally, there were strong indications that Bemore's daily functioning may have been impaired. Bemore's brother testified at the penalty phase that Bemore was beaten with an extension cord and a cane in his childhood. McKechnie may also have been aware that Bemore suffered from periodic seizure-like episodes.[15] Moreover, Bemore "freely admitt[ed] to at least a 10 year history of drug usage including PCP, heroin, marijuana and cocaine." Dr. Isabel Wright, a social anthropologist hired for the penalty phase, explained in a letter to the judge that Bemore's cocaine addiction left him "no longer able to control his behavior." Taken together, these facts—or their availability on a proper investigation— would have alerted McKechnie to the possibility of serious mental-state issues that, properly investigated, might have given rise to an alternative to the alibi defense.

---

[15] Bemore alleged in his state habeas petition that Cosby knew, and was willing to testify, that the drugs Bemore consumed made him "crazy," and that Bemore "[s]ome times [sic] for no apparent reason . . . would start drooling like he had cerebral palsy." Cosby's declaration so stating, submitted in federal habeas proceedings, was not presented to the state court. However, Dr. Fineman's declaration, which *was* before the state court, quotes from an "affidavit[]" of Cosby's including the same language about "cerebral palsy" as quoted in Bemore's state habeas petition and as appears in Cosby's the later-submitted declaration. The record is not clear whether Cosby made these statements before the trial, and, if so, whether McKechnie was aware of them.

The state contends that, once McKechnie settled on the alibi defense, he had no duty to pursue a "directly conflicting" mental health defense. *See Bean v. Calderon*, 163 F.3d 1073, 1082 (1998); *Turk v. White*, 116 F.3d 1264, 1266–68 (9th Cir. 1997). That contention puts the cart before the horse. Even if *presenting* mental health evidence would have conflicted with or diluted an alibi defense in this instance, that fact does not absolve counsel of a duty to *investigate* a mental health—or alibi—defense. That way, he could decide in an informed manner which defense was preferable, an especially critical decision where the weaknesses of an alibi should have been known.

The cases the state relies on do not undermine our determination. In *Turk*, for example, counsel adequately investigated the self-defense strategy he ultimately chose, discovered significant evidence supporting that theory, and then made an informed decision not to pursue an insanity defense that would have conflicted with the requirement that a person who acts in self-defense act "as a reasonable person." 116 F.3d at 1266. In *Bean*, counsel's decision to reject a diminished capacity defense in favor of a properly investigated alibi defense was reasonable in large part because the defendant "refus[ed] to adopt the diminished capacity defense." 163 F.3d at 1082. *See also Phillips*, 267 F.3d at 979–80 (explaining that *Turk* and *Bean* were not determinative of the IAC issue that case). These cases do not disturb the principle that counsel may not "settle[] early on an alibi defense," without investigating potential mental health defenses: "strategic decisions . . . [must] be reasonable and informed." *Jennings*, 290 F.3d at 1014 (citing *Strickland*, 466 U.S. at 691).

Nor are we convinced by the state's arguments that counsel was absolved from his duty to investigate Bemore's mental health because other evidence was inconsistent with

a guilt phase mental health defense. The state notes, first, that Dr. Fineman's report mentioned possible unfavorable diagnoses, including anti-social personality disorder, in addition to bipolar disorder and other impairments. Relying on *Hendricks v. Calderon*, which held that "even where there is a strong basis for a mental defense, an attorney may forego that defense where the attorney's experts would be subject to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion," 70 F.3d at 1038, the state argues that where counsel has obtained an unfavorable expert report, he has no duty to "shop" for differing opinions. *See Murtishaw v. Woodford*, 255 F.3d 926, 947 (9th Cir. 2001).

The state also emphasizes that evidence was adduced at trial suggesting that Muck's murder was premeditated, deliberate and intentional, and maintains that defense counsel therefore reasonably declined to investigate a mental health defense. For example, forensic experts testified that he suffered a number of non-lethal stab wounds—a result, the state argued, of Bemore's "unsuccessful effort to torture him into opening the safe." And a number of witnesses testified that Bemore told them he would not have stabbed the clerk so many times had he opened the safe rather than fighting back. Because such evidence was inconsistent with a defense that Bemore did not possess the requisite mens rea for the crime, the state argues, abandoning any investigation of a mental health defense for the guilt phase was reasonable.

The state's arguments are misguided. First, Dr. Fineman indicated that "further development was necessary" before firm conclusions could be reached. McKechnie could not have determined whether the potentially favorable expert testimony would be undermined by the partially adverse preliminary findings without the benefit of an actual diagnosis. The principle that counsel need not doggedly seek

out a favorable expert report in the face of a conclusively unfavorable one does not negate counsel's duty to follow up on a concededly *preliminary* report that both contained some potentially promising information and recommended further inquiry.

Further, that there was likely to be evidence introduced at trial consistent with premeditation, deliberation, and intent, while critical to the prejudice inquiry—as we later explain—did not absolve McKechnie of the duty to conduct an adequate mental health investigation. Notably, the alibi defense necessarily depended on convincing the jury to discredit witness reports of Bemore's incriminating statements. So a mental health defense would have been no worse in that regard than an alibi defense. And a follow-up mental health evaluation might have resulted in a diagnosis consistent with what happened during the murder.[16] Without uncovering the weaknesses of the alibi defense *or* investigating the contours of a potential mental health defense, McKechnie was not in a position to determine which defense was the more promising strategy.

Finally, many of the potential diagnoses the state cites as inconsistent with a mental health guilt phase defense would likely have been of benefit at the penalty phase. *Porter v. McCollum*, for example, held that an neuropsychologist's

---

[16] That Muck was stabbed repeatedly and over an extended period does not, as the prosecution argued, mean that the crime must have been carried out in a planned, deliberate manner. Moreover, had McKechnie made an informed decision and then pursued a mental defense, the forensic evidence that the stabbing occurred in this manner could have been disputed. Although we find it unnecessary to reach Bemore's IAC claim regarding the failure to challenge the torture special circumstance, *see infra* note 19, we note that McKechnie made no effort to dispute the forensic evidence regarding the manner of the stabbing.

report that the petitioner "suffered from brain damage that could manifest in impulsive, violent behavior" established mitigating evidence that the petitioner was "impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance." 558 U.S. 30, 36 (2009).

Had he conducted an appropriate investigation, McKechnie might have determined that a mental health defense, even if a longshot at the guilt phase, was the superior choice in view of the impending penalty phase. In capital cases, "counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." *Nixon*, 543 U.S. at 192. Where the evidence of guilt is substantial, "avoiding execution may be the best and only realistic result possible." *Id.* at 191 (quotation marks and alterations omitted) (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L.Rev. 913, 1040 (2003)). In such circumstances, counsel "may reasonably decide to focus on the trial's penalty phase, . . . [and] must strive at the guilt phase to avoid a counterproductive course." *Id.*

Presenting a weak alibi defense at the guilt phase, and thereby risking losing credibility in advocating for a client's life at the penalty phase, is often a questionable strategy, as the Supreme Court has acknowledged. *See id.* at 192; *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984).[17] As noted

---

[17] Empirical data shows that "complete innocence" guilt phase defenses are often risky, sometimes contributing to the imposition of the death penalty, and also that, even if a defendant does not express remorse for his crime, jurors react favorably to strategies that reflect an acknowledgment of responsibility. Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell

in *Yarborough v. Gentry*, if defense lawyers "make certain concessions showing that [they] are earnestly in search of the truth, then [their] comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate." 540 U.S.1, 9–10, (quoting Jacob A. Stein, Closing Argument § 204, at 10 (1992)). Given the hazards of a weak innocence defense, counsel's failure even to investigate Bemore's potential mental health issues is a strong indication of deficient performance.

Any single omission in McKechnie's investigation and preparation may not, on its own, have rendered his performance "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. But taken together, and in light of the consideration that Bemore's defense was entirely dependent on the weak, uninvestigated alibi, we conclude that "there is [no] reasonable argument that counsel satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105, by presenting that defense after failing to investigate either it or a mental health alternative.

## 2.  *Prejudice at the guilt phase*

We nevertheless affirm the district court's denial of Bemore's guilt-phase IAC claim. Reasonable jurists, we conclude, could disagree whether, as the trial actually went, Bemore has illustrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Richter*, 562 U.S. at 103.

In a case in which counsel's error was a failure adequately to investigate, demonstrating *Strickland* prejudice requires

---

L. Rev. 1557, 1589 (1998) (cited in *Nixon*, 543 U.S. at 192).

showing both a reasonable probability that counsel would have made a different decision had he investigated, and a reasonable probability that the different decision would have altered the outcome. *See Wiggins*, 539 U.S. at 535–36. On the record before us, fairminded jurists could conclude either that (1) had McKechnie conducted an adequate investigation into the alibi and available alternative defenses, he would likely have presented the alibi defense anyway, or that (2) although a reasonably competent attorney would have chosen to pursue a mental health defense instead of the alibi, the mental health defense was not reasonably likely to succeed.

To prevail on a mental health defense, Bemore would have had to prove either that "because of his mental illness or voluntary intoxication, he did not in fact form the intent unlawfully to kill," *Saille*, 54 Cal. 3d. at 1117 (emphasis omitted), or that he was not guilty by reason of insanity—i.e., that he "was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the commission of the offense," Cal. Pen. Code § 25. *See Elmore*, 59 Cal. 4th at 142–44. Bemore did present some evidence to the state habeas court tending to show that these standards might have been met. But given the evidence suggesting Muck's murder was deliberate and premeditated, the record does not provide sufficient evidence to demonstrate that any reasonable jurist would have concluded that a guilt-phase mental health defense was reasonably likely to have been successful in avoiding a guilty verdict.

Perhaps most notably, no expert testimony was presented on habeas indicating that, had follow-up mental health investigation occurred, counsel could have presented evidence sufficient to establish a mental health defense to first-degree murder. Dr. Fineman did not conduct a follow-up evaluation of Bemore for the habeas petition, despite his

insistence that a follow-up evaluation was necessary to make any firm diagnosis of Bemore's mental state. And he did not attest on habeas that Bemore's mental state at the time of the offense was consistent with any guilt phase defense to the crime. Rather, Dr. Fineman averred only that the facts "*gave rise to* the guilt-phase defense of whether he was able to form the requisite intent," and that "it is *questionable* as to whether he was capable of knowing or understanding the nature and quality of his act and of distinguishing right from wrong." (Emphases added).

Dr. Rosenthal's state habeas declaration is more definite. Dr. Rosenthal met with Bemore after trial, and, having reviewed Dr. Fineman's preliminary report and other materials, declared that Bemore "was not able at the time of the homicide to form the requisite specific intent, premeditate, deliberate, or harbor malice . . . because of his extreme mental disorders and intoxication." But any testimony negating Bemore's sanity or intent to kill or to premeditate at the time of the crime would have been countered by the substantial evidence that the crime involved deliberate, premeditated decisions. Witnesses testified that Bemore told them he stabbed Muck because he did not open the safe upon demand.

Thus, even had the defense presented a mental health defense, the jury could well have concluded from the evidence that the killing was done in a calculated manner by a perpetrator able to understand and intend the consequences of his actions. Bemore may well have garnered more sympathy with the jury had he presented a mental health defense—or no defense—in lieu of an incongruous alibi

defense.[18]   But the prejudice resulting from Bemore's appearance on the stand is not a basis on which we may grant relief at the guilt phase (although, we later conclude, it is quite pertinent to our penalty phase analysis). *See Cargle v. Mullin*, 317 F.3d 1196, 1208 (10th Cir. 2003); *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003).

In sum, Bemore has not shown a reasonable likelihood that the result at the guilt phase would have been different but for counsel's errors.   The California Supreme Court's rejection of this claim was therefore not an objectively unreasonable application of *Strickland*.[19]

---

[18] Even a better investigated and prepared alibi would not have likely have been successful.  Numerous state witnesses testified to conversations with Bemore in which he had admitted involvement in the Aztec murder and robbery. *Bemore*, 22 Cal. 4th at 820–25.  Bemore did not contest that his car was at the scene of the crime and that he was involved in opening and disposing of the stolen safe.  And knives linked to Bemore were consistent with those used to kill Muck. *Bemore*, 22 Cal. 4th at 819–20.

[19] We need not address Bemore's additional argument that McKechnie rendered constitutionally ineffective assistance at the special circumstances phase by neglecting to challenge the prosecution's theory that Muck was tortured.  Even if McKechnie had persuaded the jury not to vote for the torture special circumstance, Bemore would still have been death-eligible based on the robbery special circumstance.  True, any ineffectiveness at the special circumstances phase may have prejudiced Bemore at the *penalty* phase—facts established regarding the length of time and degree of pain Muck suffered may have made it more likely that the jury would vote for the death penalty rather than life in prison.  But because we ultimately reverse as to the penalty phase, based both on counsel's ineffective representation in investigating mitigating circumstances and also on prejudicial spillover from the guilt phase IAC, it does not matter to our ultimate judgment whether Bemore was additionally prejudiced by counsel's performance at the special circumstances phase. *See United States v. Preston*, 751 F.3d 1008, 1029 n.29 (9th Cir. 2014).

## D. IAC - Penalty Phase

The representation Bemore received at the penalty phase by counsel Barranco, like the representation by McKechnie at the guilt phase, was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Further, assuming, as we must, that the California Supreme Court concluded otherwise, its conclusion was an "objectively unreasonable" application of the Supreme Court's holding in *Strickland*. *Wiggins*, 539 U.S. at 520–21 (quoting *Williams*, 529 U.S. at 409). Finally, as to the penalty phase, we are persuaded that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *Strickland*, 466 U.S. at 687, and that "there is no possibility fairminded jurists could disagree." *Richter*, 562 U.S. at 786. We therefore reverse the denial of habeas relief with regard to imposition of the death penalty.

### 1. *Investigation of mitigating evidence*

At the penalty phase, counsel's duty to follow up on indicia of mental impairment is quite different from—and much broader and less contingent than—the more confined guilt-phase responsibility. *See Doe*, 782 F.3d at 435; *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006). At the guilt phase, a defendant's mental state is directly relevant for limited purposes—principally, as we have discussed, legal insanity or actual failure to form the requisite intent at the time of the offense. *See supra* note 14. By contrast, "[b]ecause a sentencing jury is given 'broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability,' the presentation of relevant mitigation evidence is of vital importance to the jury's penalty determination." *Frierson*, 463 F.3d at 993 (quoting *Hendricks*, 70 F.3d at 1044).

Consequently, "'[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.'" *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). "To that end, trial counsel must inquire into a defendant's social background, family abuse, mental impairment, physical health history, and substance abuse history; obtain and examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads." *Id.* (quoting *Hamilton v. Ayers*, 583 F.3d 1100, 1113 (9th Cir. 2009)). Where counsel is aware of potentially mitigating evidence, he or she must investigate that evidence, absent a reasonable strategic reason not to do so. *Hendricks*, 70 F.3d at 1039.

Barranco's penalty-phase investigation failed to meet these standards. Like McKechnie, Barranco was on notice, through preliminary hearing testimony, transcripts of the state's interviews with Bates Street residents, and her own conversations with Bemore's friends and family, that Bemore had periodic manic-like episodes; was a heavy drug user; and was severely beaten as a child in a manner and to a degree that brain damage could have resulted. Barranco was also aware, through Dr. Fineman's preliminary diagnoses, that Bemore may have been bipolar or suffered other mental disorders. And, notably, while many of Dr. Fineman's diagnoses were preliminary, he conclusively found that Bemore suffered "mild, diffuse organic impairment," and exhibited impaired reasoning skills, judgment, and ability "to control his impulsivity."

Despite these indications, Barranco purposely truncated the inquiry into Bemore's mental health. She hired Dr. Fineman specifically for the purpose of developing the "sun child" theory that would have explained Bemore's drug use

as the product of cultural pressures, *not* to develop evidence of mental impairment. When Dr. Fineman reported that Bemore did suffer a number of mental impairments and possible disorders, and recommended further inquiry, she terminated his involvement and put his report in the back of a drawer. And Dr. Bucky, who testified only about the impact on Bemore of growing up in a family with chemical dependency, was "neither asked . . . to conduct any psychological testing of Mr. Bemore nor requested . . . [to] give an opinion as to his mental state at the time of the homicide." The net result was that there was, except for Dr. Fineman's fairly vague "organic impairment" assessment, and despite Dr. Fineman's indications of possible, serious mental health issues, no definitive conclusion concerning either Bemore's mental state at the time of the crime or his overall mental health diagnosis.

None of the state's arguments in defense of Barranco's ill-considered decision to brush aside any mental health mitigation inquiry are convincing. The state points to the "over forty witnesses" who did testify for the defense at the penalty phase. Many of these witnesses knew Bemore only slightly, as one-time basketball teammates or co-workers. One witness was an orthopedic surgeon who testified about a foot injury Bemore had suffered. The vast majority spoke only about their perception that Bemore had good character. But "the ABA Standards prevailing at the time called for [Bemore]'s counsel to cover several broad categories of mitigating evidence," not just one. *Van Hook*, 558 U.S. at 11. And a good character defense was unlikely to be persuasive to a jury that had just decided that Bemore had carried out a grizzly murder, including torturing the victim, and had lied on the stand to boot.

Some of the defense penalty phase witnesses did mention Bemore's drug problems and tumultuous upbringing. Even

so, it is not enough just to present "extensive mitigating evidence" where particularly persuasive evidence—especially evidence in the form of expert testimony—was omitted. *Caro*, 165 F.3d at 1227.

*Caro* held, for instance, that a petitioner was entitled to an evidentiary hearing on an IAC claim because his lawyer had not engaged toxicologists or neurologists to evaluate the impact of the petitioner's extensive chemical exposure, nor provided "those experts who did examine [him] with the information necessary to make an accurate evaluation." *Id.* at 1227; *see also id.* at 1226–27. We so held even though the jury was presented with evidence that the petitioner was beaten as a child and exposed to chemicals. *Id.* at 1230 (Kleinfeld, J., dissenting). As *Caro* made clear, it is not enough that some of the defense witnesses informed the jury of the facts that might *underlie* a mental health mitigation defense; "expert testimony to explain the ramifications of those experiences on [petitioner's] behavior . . . is necessary." *Id.* at 1227 (maj. op.).

The state also maintains that it would have been apparent from the outset that a mental health defense would have conflicted with Barranco's strategy of presenting Bemore as "a good guy with a drug problem, garnering whatever benefit [she] could from the notion of lingering doubt." Had Dr. Fineman testified, the state argues, the state would have cross-examined him about some of the adverse elements of his initial report—namely, that Bemore, in addition to possibly suffering from bipolar disorder and organic impairment, was "subtly controlling," "self-indulgent," unable to "empathize with others," and possibly a sociopath. These findings would have cast doubt on Bemore's character, the state suggests, and so Barranco could have made a strategic decision not to pursue a theory that would allow those findings to come out.

This reasoning is unpersuasive, for several reasons. First, Barranco's investigation into her chosen "good guy" mitigation strategy itself contained a serious omission, making her decision to pursue that approach in lieu of presenting mental health evidence uninformed in that respect.[20] As part of her "good guy" strategy, Barranco attempted to present Bemore as a good inmate, which opened the door to damaging rebuttal testimony about Bemore's bad behavior in jail, including several instances of assault and, most particularly, his role in the alleged food-tampering incident that sent a number of prisoners to the hospital in the hope of fostering escape. Barranco expected that evidence of the food tampering incident would not be admitted, as she thought—erroneously—that Bemore had been found factually innocent of the offense. *See Bemore*, 22 Cal. 4th at 849. In fact, Barranco admitted to the trial court that she had relied on "rumor and hearsay," *id.* (alteration omitted), rather than looking into the food tampering case herself, and told the court that "she would not have introduced good inmate evidence 'at all' had she known the food tampering evidence

---

[20] On direct appeal, the California Supreme Court addressed the narrow question whether Barranco provided ineffective assistance by presenting evidence of Bemore's good behavior in jail, as that evidence opened the door to damaging rebuttal testimony about the uninvestigated food-tampering incident. *See Bemore*, 22 Cal. 4th at 850–51. The court held that the food-tampering testimony was not so damaging that it would have altered a reasonably competent attorney's defense strategy. On the whole, the court reasoned, Barranco made an informed decision to present the "good inmate" evidence and "risk unfavorable revelations on rebuttal." *Id.* at 851. We assume, for present purposes, that the California Supreme Court reasonably applied *Strickland* in concluding that Barranco's presentation of "good inmate" testimony and her investigation of the food-tampering incident did not themselves fall below *Strickland*'s standard for effective assistance of counsel. *See* 28 U.S.C. § 2254(d)(1). But that assumption does not address the reasonableness of the California Supreme Court's denial of relief on the much broader penalty phase IAC claim, discussed above, on habeas review.

'had happened' and 'could come in . . . as the last evidence the jury hear[d] before they deliberate penalty.'" *Id.* Given that Barranco should have been aware the state would attempt to rebut evidence of Bemore's good behavior in jail, her failure to examine the details of the incident is, at least, strong evidence of deficient performance. *See Rompilla v. Beard*, 545 U.S. 374, 383–85 (2005) (holding that the state court unreasonably applied *Strickland* in concluding that counsel's performance was adequate, where counsel failed to examine a publically available file on the defendant's prior conviction).

Second, while it "may well have been strategically defensible upon a reasonably thorough investigation" to rely on good character evidence *in addition to* mental health evidence, "the two sentencing strategies are not necessarily mutually exclusive." *Wiggins*, 539 U.S. at 535. One can have a serious mental illness and still be a good friend and kind person. A defense that Bemore was "a good guy with a drug problem," was fully consistent with a defense that he was a good guy who was plagued by a drug problem *and* mental illness. And even if the mental health evidence showed Bemore to be impaired in a manner that made him self-serving, explosive, and violent, as the state contends, "brain damage that could manifest in impulsive, violent behavior" is nonetheless mitigating, as it indicates that Bemore was "substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance." *Porter*, 558 U.S. at 36.

Third, a decision is not a "strategic" one if not informed. The question under *Strickland* is not only "whether counsel should have presented a [different] mitigation case," but also "whether the investigation supporting [counsel's] decision not to introduce mitigating evidence . . . was *itself reasonable*." *Wiggins*, 539 U.S. at 523.

We recently held, in *Elmore v. Sinclair*, for example, that it was a reasonable strategic decision for counsel to pursue a remorse mitigation defense in lieu of a mental health defense that would "detract from, or destroy, the remorse strategy." 781 F.3d 1160, 1172 (9th Cir. 2015). In *Elmore*, counsel hired two mental health experts to evaluate the defendant, and, armed with their conclusions, conducted two mock trials. The mock trials showed that jurors responded more favorably to a defense based on remorse and acceptance of responsibility than to one based on the defendant's mental health or brain damage. *Id.* Here, by contrast, Barranco decided to present her "good guy" mitigation defense without first investigating appropriately the mental health alternative. When an alternative in the form of a mental health mitigation strategy became apparent by way of Dr. Fineman's report and anecdotes from Bemore's friends and family, she precipitously pushed that possibility aside as inconsistent with the "sun child" aspect of her planned "good guy" mitigation presentation.

In short, Barranco's early decision to pursue a risk-fraught "good guy" mitigation strategy did not satisfy her duty first to unearth potentially mitigating mental health evidence. *See Wiggins*, 539 U.S. at 535–36. "In deferring to counsel's decision not to pursue a [mental health] mitigation case despite [counsel's] unreasonable investigation, the [California Supreme Court] unreasonably applied *Strickland*." *Id.* at 534.

## 2. *Prejudice at the penalty phase*

To determine whether Barranco's failure to investigate and uncover mitigating evidence prejudiced Bemore, we must consider both whether there is "a reasonable probability that a competent attorney, aware of this [evidence], would have introduced it at sentencing," and that "had the jury been

confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 535, 536. If no reasonable jurist could disagree that the mitigating evidence a proper investigation would have uncovered "may have meant the difference between a life or death sentence," *Daniels v. Woodford*, 428 F.3d at 1210, we must grant relief. *See Pinholster*, 131 S.Ct. at 1403.

The available mitigating mental health evidence was compelling. Even without the benefit of a final diagnosis, Dr. Fineman had determined, before trial, that Bemore had organic brain damage and "a fundamental inability to control his behavior" when his "needs press upon him." Reviewing Dr. Fineman's report in light of information about Bemore's drug use just before the crime and his history of erratic, explosive behavior, Dr. Rosenthal stated that whatever Bemore's specific condition might be, it was clear at the time of trial that his ability "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." Cal. Penal Code § 190.3(h). Dr. Fineman's and Dr. Rosenthal's conclusions would have been bolstered by Dr. Wright's statement that "[o]nce Bemore stated using Crack he was no longer able to control his behavior," and by available testimony from Bemore's friends that he was prone to uncontrollable manic-like episodes. Troy Patterson, for example, stated in his declaration that, had he been asked, he would have testified that, at the time of the Aztec incident, Bemore was "constantly using mind-altering drugs" that "made him crazy . . . flip out, go out of his mind and lose control of himself."

At the penalty phase, the jury was explicitly instructed to take mental health evidence into account, by considering whether Bemore was "under the influence of mental or emotional disturbance" and whether his "capacity . . . to

appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or effects of intoxication." The prosecution affirmatively addressed each of these issues during closing argument, emphatically stating that Bemore "wasn't under the influence of any extreme mental or emotional disturbance," and that his capacity to conform his conduct with the law was not diminished by intoxication or mental defect. Had the mental health evidence been presented, this reductive argument could not have been made. At the capital penalty phase, where the jury is given broad latitude to consider all factors that bear on whether a defendant ought to live or die, *see Frierson*, 463 F.3d at 993, a reasonably competent attorney would have presented that evidence, *see Wiggins*, 539 U.S. at 535–36.

That Cosby received twenty-five years to life for Muck's murder is also of some relevance to our conclusion regarding *Strickland* prejudice.[21] Cosby, whose attorneys presented evidence of impaired judgment due to drug use and organic brain damage, received this lesser sentence despite his having been concurrently convicted, by a single jury, of a second robbery and murder. In ruling on a motion to reconsider Bemore's death sentence, Judge Gill stated that the significantly different sentence in the Cosby trial was "in [his] mind." He was satisfied that the discrepancy was justified, however, because in "the case of Mr. Cosby there was some fairly convincing evidence [of] head trauma he sustained as an infant . . . [and] demonstrable physiological damages and deficits." He noted that "[t]here's no such evidence in the case of Mr. Bemore." Had mental health

---

[21] The result in Cosby's trial is, of course, not itself a sufficient basis for determining the likely impact of mental health evidence in Bemore's penalty phase. *C.f. Pulley v. Harris*, 465 U.S. 37, 43–46 (1984).

evidence  been presented, "there is clearly a reasonable probability that the . . . jury—and the . . . judge—'would have struck a different balance,' and it [was] unreasonable to conclude otherwise."  *Porter*, 558 U.S. at 42 (quoting *Wiggins*, 539 U.S. at 537).

Our conclusions with regard to IAC at the guilt phase further support our conclusion that it would have been objectively unreasonable for the state court to conclude that the *Strickland* prejudice standard was not met at the penalty phase.  First, as a general matter, "[e]vidence that might not rise to the level of defense of a crime may nonetheless be important mitigating evidence."  S*tanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010).  And second, in this instance, counsel's guilt phase IAC in choosing, between two inadequately investigated defenses, each unlikely to succeed, a weak alibi defense likely to undermine Bemore's credibility and thus the likelihood of jury sympathy for him, could well have contributed to the outcome of the penalty phase.  The two ineffective representation decisions—not putting on a mental health mitigation defense at the penalty phase, and putting on a guilt phase defense both unlikely to succeed and likely adversely to affect the jury's view of Bemore for the penalty phase—must be viewed cumulatively in determining whether the *Strickland* prejudice standard was met with regard to the jury's decision to sentence Bemore to death. *See Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973); *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003).

As the state indicates, the prosecution did present significant aggravating evidence, including allegations of assault and rape.  But mitigating mental health evidence would have proven a heavy counterweight.  In addition to lessening Bemore's culpability for the Aztec crimes, such testimony would likely have affected the jury's opinion with regard to the unadjudicated offenses.

Prejudice under *Strickland* does not require a showing that counsel's actions "more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. For Bemore to have avoided the death penalty, only one juror need have been persuaded by mitigating evidence to show mercy and vote against a capital sentence. So Bemore need only show that counsel's errors were "sufficient to undermine confidence in the outcome" reached by a single juror. *Id.* at 694.**[22]**

In denying Bemore's penalty-phase IAC claim, the state court "either did not consider or unreasonably discounted the mitigation evidence" that could have been presented. *Porter*, 558 U.S. at 42. We conclude that mitigating mental health evidence, combined with a different guilt phase strategy, "'might well have influenced the jury's appraisal' of [Bemore's] moral culpability," *Wiggins*, 539 U.S. at 538 (quoting *Williams*, 529 U.S. at 398), and that the state court's contrary conclusion constituted an unreasonable application of *Strickland*.

## E. Discovery Motions

In addition to denying Bemore's claims on the merits, the district court denied Bemore's motion for an evidentiary hearing and motion for leave to take depositions of three defense witness. Bemore appeals denial of both motions. The district court's ruling on the discovery motions is reviewed for abuse of discretion. *Mabe v. San Bernadino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1112 (9th Cir. 2001).

---

**[22]** *Richter* noted that "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard" may be "slight." 562 U.S. at 112. Even so, there *is* a difference, which could matter in some instances. So precision as to the applicable standard is essential.

As to Bemore's claim of IAC at the penalty phase, our conclusion that declarations and other evidence already in the record presented to the state court support Bemore's claim obviates any need to remand for discovery.

With regard to discovery on Bemore's guilt phase IAC claim, we may not consider new evidence unless the state court's legal conclusions were contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or its determination of facts was unreasonable in light of the evidence presented to the state court, 28 U.S.C. §2254(d). *See Pinholster*, 131 S. Ct. at 1398–99; *Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir. 2005). We reject Bemore's argument that the state court's denial of an evidentiary hearing rendered its determination of facts unreasonable, *see* §2254(d)(2); *Hurles v. Ryan*, 752 F.3d 768, 791–92 (2014). "Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that state court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Pinholster*, 131 S. Ct. at 1402 n.2 (quoting *In re Clark*, 5 Cal. 4th 750, 770 (Cal. 1993)) (alterations in original). As Bemore has not shown that it was unreasonable or contrary to clearly established federal law for the state court to conclude that, taking the factual allegations in his habeas petition to be true, he was not entitled to relief on his guilt phase claim, *see People v. Duvall*, 9 Cal. 4th 464, 474–75 (1995), further discovery is not warranted, and the district court did not abuse its discretion in denying the motion.[23]

---

[23] We further reject Bemore's contention that an evidentiary hearing is warranted based on new evidence that presents a new, unexhausted claim, as Bemore has not shown "good cause for not presenting the new evidence to the state court." *Gonzalez*, 667 F.3d at 972, 980; *see supra* note 9.

### III. CONCLUSION

We **AFFIRM** the district court's denial of habeas relief on Bemore's claim that his counsel was constitutionally ineffective at the guilt phase. We **REVERSE** the district court's denial of habeas relief with respect to Bemore's penalty phase IAC claim and **REMAND** with instructions to grant the petition for a writ of habeas corpus with respect to the penalty phase and return the case to the state court to reduce Bemore's sentence to life without parole, unless the State of California elects to pursue a new capital sentencing proceeding within a reasonable amount of time as determined by the district court.

**AFFIRMED in part, REVERSED in part and REMANDED.**